CITIZENS' TRUST & GUARANTY CO. OF WEST VIRGINIA v. GLOBE & RUTGERS FIRE INS. CO.

(Circuit Court of Appeals, Fourth Circuit. December 10, 1915.)

No. 1336.

1. INSURANCE ⊜⇒560—NOTICE OF LOSS—WAIVER.

A policy of fidelity insurance issued to an insurance company on account of an agency required the assured to give immediate notice of any loss, or of facts indicating that loss had probably been sustained. The assured notified the insurer of a claim against the agency several months overdue, explaining that the delay in giving notice was due to its continued attempts to obtain settlement and statement of the account. The insurer, without objecting to the notice, also assisted in trying to obtain an agreement between the parties. *Held*, that it thereby waived the condition requiring immediate notice.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1393–1404; Dec. Dig. ⊜⇒560.]

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. INSURANCE ⊂⇒556—WAIVER OF CONDITIONS—AUTHORITY.

A provision of an insurance policy that none of its conditions shall be deemed waived, unless in writing, signed by the president or vice president of the company, with its seal attached, cannot prevent a waiver by the company itself, acting through its officers who have charge of its business.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1374–1377; Dec. Dig. ⊂⇒556.]

3. INSURANCE ⊂⇒665—FIDELITY INSURANCE—CONSTRUCTION OF POLICY.

Evidence *held* to sustain a recovery on a policy insuring against loss by reason of "fraud or dishonesty" of an agent, where, while there was a dispute between the principal and agent as to the amount of compensation which the agent was entitled to retain from collections made, he used the money so collected, and was unable to pay it over on final settlement.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⊂⇒665.]

4. INSURANCE ⊂⇒285—AVOIDANCE FOR CONCEALMENT—SURETY BOND.

A renewal surety bond, insuring a principal against loss by reason of the fraud or dishonesty of an agent, which was procured by the agent, is not invalidated by the fact that, when the renewal was made, the agent owed the principal a considerable balance, of which the insurer was not advised, where the principal had no communication with the insurer, was not asked the state of its account, and had no knowledge of fraud or dishonesty on the part of the agent.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 657; Dec. Dig. ⊂⇒285.]

5. INSURANCE ⊂⇒168—SURETY BOND—CONSTRUCTION.

A mere recital in a surety bond given by an agent that he has been appointed agent at a certain place does not limit the scope of the bond, or the liability of the surety to business done by the agent at such place.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 325; Dec. Dig. ⊂⇒168.]

In Error to the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Action at law by the Globe & Rutgers Fire Insurance Company against the Citizens' Trust & Guaranty Company of West Virginia. Judgment for plaintiff, and defendant brings error. Reversed.

B. M. Ambler, of Parkersburg, W. Va. (Van Winkle & Ambler, of Parkersburg, W. Va., on the brief), for plaintiff in error.

H. W. Hayward, of New York City (Reese Blizzard, of Parkersburg, W. Va., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

WOODS, Circuit Judge. This action was on two surety bonds given to the Globe & Rutgers Fire Insurance Company by the Citizens' Guaranty Company, in behalf of a corporate agency of the insurance company, first called General Southern Agency, and retaining its identity through several changes of name. The first bond for $10,000, covering the period from June 7, 1906, to June 7, 1907, was extended to June 7, 1908; the second, for $5,000, covered the period from July 15, 1908, to July 15, 1909. The District Judge instructed a verdict for $5,000 and interest, aggregating $6,400, for defaults secured by

both bonds under the terms of the second bond. In giving this instruction the court held, first, that under the report of the commissioner appointed to state the account between the fire insurance company and its agent and the evidence taken in open court there was no real dispute that the default under both bonds, recoverable under the terms of the second bond, after allowing all credits, was more than the $5,000; and, second, "that because defendant company, after notification and knowledge of the relations existing between plaintiff and its agent, demanded statements of the accounts and proofs of loss, and based its refusal to pay solely on the ground that Fowler & Co. were claiming credits and sets-off, it is estopped from denying its obligations upon its bonds for other reasons than account of such sets-off." The insurance company accepts the verdict, and does not assign error in the denial of a larger recovery.

[1] The evidence supports the conclusion of the District Judge that there was a waiver of the condition that, "upon the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained, the employer shall immediately so notify the company in writing, at its principal office in the city of Parkersburg." The letter of the insurance company of October 16, 1908, notifying the surety company of the balances claimed against the agency, gave the information that balances had been several months overdue, and that there had been delay in giving notice under the policy on account of long and persistent efforts to obtain a settlement with the agent. The surety company in reply made no allusion to the delay in giving notice, and in a somewhat protracted correspondence sought to bring the insurance company and its agency to an agreement as to the amount due. This correspondence indicates clearly that the surety company intended to proceed in the matter of ascertaining its liability on the theory that the letter of October 16, 1908, was due notice of the alleged default, and it shows an effort by the assured to comply with the requests made of it. On this point the case, therefore, falls within the rule that any course of action which leads the assured to believe that by conforming thereto the condition of immediate notice will not be insisted on, followed by labor or expense in the effort to conform, will operate as waiver or estoppel. Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689; Hartford Co. v. Unsell, 144 U. S. 439, 12 Sup. Ct. 671, 36 L. Ed. 496; Northern Assurance Co. v. Grand View Building Association, 183 U. S. 308, 22 Sup. Ct. 133, 46 L. Ed. 213. It is true that later, on November 13th, the defendant wrote to the insurance company:

"We beg to say again that we cannot consider this claim until a settlement is reached; with Fowler & Co., or (if settlement cannot be had) until your claim is established by process of law. Then, if we are liable, we will pay; otherwise we cannot do so. * * * Fowler & Co. dispute your claim. * * * We understand that Fowler & Co. are ready to pay any balance which they may owe you, whenever the same may be ascertained by a proper settlement or by a court of competent jurisdiction. * * * It appears that they have asked you for a settlement of the contingent commission account, which has not been furnished. It seems to us that Fowler & Co. are entitled to a detailed statement of the account; and if it were furnished it would certainly put an end to excuses for delay on that ground. We suggest that you

render a detailed statement setting forth fully your contention (just as if you would have to do if you were proving your claim in court), and we fully believe that you would have no trouble in reaching a settlement with them. We are sending a copy of this letter to Fowler & Co."

But this letter could not avail to recall the waiver on which the insurance company had acted in trying to comply with the surety company's demand that it come to an agreement with the agent as to the amount due.

[2] It is argued, however, that the correspondence could not operate as a waiver, because the bond provides:

"Fourteenth. None of the conditions or provisions contained in this bond shall be deemed to have been waived by or on behalf of the company, unless the waiver be clearly expressed in writing over the signature of its president or vice president, and its seal be thereto affixed, duly attested."

There can be no doubt that the same authority that issues a bond may waive any of its conditions. The provision quoted is valid in denying to any agent of the company the power to waive any of the conditions or provisions of the policy, unless the waiver should be under the signature of the president or vice president, and under the seal of the company. But it cannot mean that the company itself cannot waive or otherwise contract with reference to the insurance in any way it should see fit. The letters which expressed the intention to waive the requirement as to notice were sent from the general office of the company, and they were signed by the secretary, presumably under the authority of the company. Hence the waiver was by the company itself. Insurance v. Norton, supra.

[3] The bonds expressly limit liability to such pecuniary loss as may be sustained "by reason of the fraud or dishonesty of the employé," and expressly exclude "any loss occasioned by accident, mistake, negligence, error of judgment on the part of, or breach of contract by, the employé." There is nothing in the evidence showing that the surety company intended to extend its obligation to cover a liability not expressed in the bonds, or to admit that the employé had been guilty of fraud or dishonesty. On the contrary, the correspondence indicates the confidence of the surety company that the agency had acted in good faith. Taken together, the letters might well be regarded as importing refusal of the surety company to consider whether any default fell under its obligation until the amount of the default had been ascertained by proof or agreement.

Still we think the evidence did not make a serious issue of fact as to whether the agent had been guilty of fraud or dishonesty. The general rule is that an agent is guilty of fraud or dishonesty when he collects money belonging to his principal and uses it for his own purposes, or refuses to turn it over. But if there be mutual demands, and the failure to settle be due to an honest conviction of the agent that he has good offsets against the balance appearing against him, he cannot be said to be acting fraudulently or dishonestly in the mere withholding of the balance to the extent of the amount claimed by him until the true amount due by him be ascertained. Nevertheless, under such circumstances, the agent is bound in honesty not to use the money

collected for his principal, but to hold the whole amount ready for settlement when the offsets claimed are passed upon, and the true balance ascertained; and if he uses the money, so that he is unable to pay it over upon the final settlement, he is guilty of dishonesty. This is the rule applicable here. Assuming that the claims of offsets by the agent were made in good faith, and that one of them was valid, and should have been allowed to the extent of the amount claimed, yet these offsets were claimed, not for payments or disbursements on account of the principal, but for additional compensation. This additional compensation was in dispute, and the plain duty of the agent, which honesty required, was to hold all funds collected for his principal until the dispute was settled. This he failed to do, and when insolvency came he was unable to turn over the money he held in trust. This view of his conduct as dishonesty is made clearer by the fact that the agent admitted a large balance to be due and promised a remittance of $2,500 thereon. The meaning of fraud and dishonesty extends beyond acts which would be criminal. They are to be given a broad signification, and taken most strongly against the surety company. City Trust Company v. Lee, 204 Ill. 69, 68 N. E. 488; United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co., 148 Fed. 353, 78 C. C. A. 345.

[4] It is admitted by the plaintiff that when the $5,000 bond was given on July 15, 1908, the agent owed a considerable balance on his account. The defendant insists, as a matter of law, that the failure of the insurance company to inform the surety company of this default was a fraud, which annulled the bond. The undisputed fact is that the insurance company had no communication with the surety company as to the giving of the bonds, and that it merely received the bonds which the agent had procured. The surety company made no inquiry of the insurance company as to the state of the agent's accounts. Having chosen to act on its own responsibility, in the absence of concealment or knowledge of the insurance company of intentional wrongdoing of the agent, the surety company must abide the consequences. Under the same conditions the surety was held liable in Magee v. Manhattan Life Insurance Co., 92 U. S. 93, 23 L. Ed. 699, the court saying:

"The plea does not set forth any of the circumstances attending the execution and delivery of the bond. It does not aver that there was any misrepresentation, anything fraudulently kept back, or any opportunity to make disclosures on the part of the company, or any inquiry by the sureties, before the bond was delivered. Nor is it averred that the company was aware that the sureties were ignorant of the facts complained of. It is, perhaps, to be inferred from the plea that the fact was—as the record, aside from the plea, shows it to have been—that the bond was executed at Mobile, and sent by Voorhees by mail to the company in New York. If this were so, the company, upon receiving it, was under no obligation to make any communication to the sureties. The validity of the bond could not depend upon their doing so. The company had a right to presume that the sureties knew all they desired to know, and were content to give the instrument without further information from any source. Under these circumstances, it was too late, after the breach occurred, to set up this defense."

[5] It is insisted that no liability could attach under the bond for business done by an office maintained in the city of Baltimore, for the

reason that the first bond contains the recital "that the General South-ern Agency had been appointed agents of the insurance company at Bluefield, W. Va." It seems evident that the bare recital of the loca-tion of the agency did not limit the territory in which the agency was to do business.

The objection to the introduction of a number of letters seems to have no foundation. They were letters between the parties or their counsel, and between the insurance company and the agent. All of them bear on the question whether there was a fraudulent or dishonest default by the agent.

The questions propounded to Fowler, representative of the agency, called for his interpretation of written contracts, and were properly excluded.

The point of chief difficulty is the method of ascertainment of the amount of the liability. The first bond was effective from June 7, 1906, to June 7, 1908; the second was effective for one year from its date July 15, 1908. Thus it appears that there was an unbonded period from June 7, 1908, to July 15, 1908. The second bond contained these provisions:

"First. The company shall not be liable hereunder for any sum or amount whatever, which the employé may, at the commencement of the term herein-before provided for, owe the employer."

"Third. The company, upon the execution of this bond, shall not thereafter be liable to the employer under any previous bond executed in behalf of the employé, and upon the execution of the company of any new bond to the em-ployer in behalf of the employé, all the obligations of this bond shall immedi-ately cease and determine; it being mutually understood that it is the inten-tion of this provision that but one (the last) bond shall be in force at one time: Provided however, that the employer shall have the right, within six months after the termination of any previous bond, to make claim for, and proof of, any loss occurring thereunder; but if any claim be so made under any previous bond during the said period of six months, and if loss also oc-cur under this bond, the aggregate liability of the company for all losses under all bonds shall not exceed the sum of ——— dollars."

Although the limitation is left blank, there seems to be no dispute that the intention was to limit the total liability under the two bonds to the amount of the second bond, $5,000. The result is that the surety company is not liable for any default occurring between June 7, 1908, and July 15, 1908; but it is liable for the aggregate defaults, not only of the period covered by the second bond, but also of the period cov-ered by the first subject to the limitation that the entire liability shall not exceed $5,000.

The monthly balances against the agency were not due until the ex-piration of 60 days after the monthly reports. Hence there was no default until the expiration of 60 days after each report. But the agency was liable to the insurance company as soon as money was col-lected by it for the credit of the insurance company; and the under-taking of the surety company immediately attached to credits to the insurance company in the hands of the agency. The surety company was bound to see that these collections were honestly accounted for. It follows that under the first bond the surety company was liable for all amounts reported by the agency to be in its hands up to June 7,

1908, less all payments made thereon and all credits which the agency was entitled to at that date, including the $2,500 or less amount allowed to the agency under its contract.

While the surety company is not liable for any amounts collected for the unbonded period from June 7, 1908, to July 15, 1908, this exemption does not extend to amounts which had been previously collected, and reported during this unbonded period. On July 15, 1908, when the second bond was given, the surety company was chargeable with the balance unpaid under the old bond ascertained as above indicated. The liability under the terms of the new bond commences with this balance. To it is to be added all collections made from July 15, 1908, to the close of the agency's transactions, including the balances which fell due under the 60-day rule after the termination of the agency, less payments made by the agency and amounts collected from subagents. The amounts collected from subagents cannot be credited on moneys collected and accounted for during the unbonded period, because the presumption, in the absence of proof to the contrary, is that the subagents remitted the balances in their hands as they fell due, and that the collections from them after the termination of the agency were for the later months covered by the last bond.

Under this method of the application of the credits the account will stand thus:

| | | |
|---|---|---|
| Total balance of the entire period, including unbonded period.... | | $10,251 24 |
| Less collections in unbonded period.......................... | | 3,742 89 |
| Total balance accruing during bonded period................. | | $ 6,508 35 |
| Less credit under contract........................ | $2,500 00 | |
| Less collections from subagents.................. | 1,497 79 | 3,997 79 |
| Net balance...................................... | | $ 2,510 56 |
| Interest from May 6, 1909, date of proofs of loss, to January 13, 1914, first day of the term of District Court at 6 per cent. per annum, on $2,510.56.................................. | | 705 69 |
| Total amount due on bonds.......................... | | $ 3,216 25 |

The result is that the judgment of the District Court must be reversed, and a new trial ordered, unless the plaintiff shall within 60 days after this judgment remit from his recovery $3,183.75 the difference between his judgment, $6,400, and the amount above stated. The main points of doubt are whether the above credit of $2,500 should be reduced to $1,900, as found by the commissioner, and whether $3,742.89 is the true amount collected and unpaid by the agency for the unbonded period. It is possible, too, that the plaintiff may be able to show affirmatively that the amounts collected from subagents, $1,497.-79, were on account of unpaid balance of the unbonded period. If so, that sum should be taken from the total balance of the unbonded period, claimed to be $3,742.89, before such balance of the unbonded period is subtracted from the total balance of $10,251.24. Upon these points we are not to be understood as expressing any opinion. The credits are given for the full amounts claimed by the defendant merely by way of illustration, and to end the litigation, in case the plaintiff

should prefer to accept the amounts contended for by the defendant in these particulars, rather than incur the expense of a new trial.

Reversed.