The **CITIZENS STATE BANK,** Hartford City, Indiana, Plaintiff-Appellee,

v.

**TRANSAMERICA INSURANCE COMPANY,** Defendant-Appellant.

No. 18969.

United States Court of Appeals, Seventh Circuit.

Nov. 29, 1971.

Mark W. Gray, John T. Lorenz, Indianapolis, Ind., David B. Keller, Fort Wayne, Ind., Howard J. DeTrude, Jr., Indianapolis, Ind., for defendant-appellant; Kightlinger, Young, Gray & Hudson, Indianapolis Ind., of counsel.

George E. Fruechtenicht, Fort Wayne, Ind., Max C. Peterson, Hartford City, Ind., Rothberg, Gallmeyer, Fruechtenicht & Logan, Martin T. Fletcher, Fort Wayne, Ind., Peterson, Ervin & Barry, Hartford City, Ind., for plaintiff-appellee.

Before KILEY, CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The question posed by this diversity case [1] is whether a bank employee's seemingly profitless and motiveless act assertedly causing a loss to the bank was "dishonest" under the terms of a blanket bond.

Transamerica Insurance Company (Transamerica), in consideration of an agreed premium, issued its Bankers' Blanket Bond, effective April 19, 1968, wherein it undertook to indemnify the Citizens State Bank, Hartford City, Indiana (Citizens), to an amount not exceeding $400,000 "from and against any losses sustained and discovered as hereinafter set forth." [2] Seven categories of losses were specifically described including "[a]ny loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of the Employees." The word "Employees" was defined to include "officers, clerks and other employees."

Frederick L. Gross (Gross) was the cashier at Citizens from June 15, 1962 until January 15, 1968, when he became a vice president, in which capacity he remained until his death on August 26, 1968.

The Indiana National Bank of Indianapolis, Indiana, (Indiana National) was Citizens' principal correspondent bank, in which Citizens carried an account to facilitate the collection of out-of-town items deposited with or cashed by Citizens.

The ordinary banking procedure was that all out-of-town checks and other items [3] were forwarded by mail on a daily basis by Citizens to Indiana National after either having been credited to the customer's account or cashed for the customer by Citizens. Citizens' account

1. The plaintiff is an Indiana banking institution and the defendant is a California corporation.

2. From April 19, 1965 to April 19, 1968, there was in full force and effect a bond with the same terms and conditions from Transamerica to Citizens.

3. Except items drawn on Chicago banks or federal government checks, which were sent to Chicago for collection.

with Indiana National would be credited with all forwarded items. Indiana National would then endeavor to collect the items from the respective out-of-town drawee banks. If a check was dishonored by a particular drawee bank for insufficient funds or any other reason, the drawee bank would return the check to Indiana National, which in turn would return it to Citizens by mail and charge Citizens' account for it.

It was the normal function of Gross, first as cashier and later as vice president, to receive and assume the responsibility for handling items returned from Indiana National by (1) causing to be reflected in Citizens' books of account the diminution of Citizens' account with Indiana National and (2) rendering Citizens whole for such amounts either by charging the particular customer's account, by communicating with the customer in order to cause the customer to deliver or deposit cash with Citizens in reimbursement, or by sending the item through for collection again if that course promised potential payment.

Citizens at all times maintained a reconcilement ledger showing the balances of its accounts with all its corresponding banks including Indiana National. In accordance with an internal bank rule, no person authorized to draw checks against Citizens' accounts with its correspondent banks was authorized to maintain or make entries in the reconcilement ledger. Since Gross was authorized to draw checks, he was not permitted to make entries in the ledger; instead, entries were to be made by an employee, Agnes Schweier, who was to do so under Gross' supervision. Agnes Schweier became ill and retired on August 23, 1967 and died in October. Her duties were transferred to Mary Wood, who succeeded her as assistant to Gross.

About a year later, the Department of Financial Institutions of the State of Indiana in the course of its annual examination of Citizens reported a discrepancy of approximately $38,000 in Citizens' account with Indiana National. As a consequence of this report, on Saturday, August 24, 1968, the president of Citizens went to the bank to try to determine the source of the discrepancy. He telephoned Gross to ask him where the reconcilement ledger was located, whereupon Gross came to the bank. He told the president that he did not know where the ledger could be found and volunteered the statement, "Well, I have not taken anything."

On August 26, 1968, Gross died at the age of 43 years as the result of a self-inflicted wound caused by a bullet from a .45 caliber automatic pistol.

Immediately following Gross' death Citizens employed certified public accountants who were able to determine that the discrepancy in the Citizens–Indiana National account was caused by the failure to charge back to customers dishonored checks returned to Citizens by Indiana National. Neither the reconcilement ledger nor the dishonored checks were found at that time.

The current bank records were kept on the first and second floors of the bank building. On January 7, 1970, a trust officer of the bank, while searching in the bank basement for a real estate abstract, found the reconcilement ledger behind other record books in the dead storage filing vault and then found a large brown manila envelope leaning next to and hidden by a one-drawer filing cabinet located on the floor of the vault. Both the ledger and the envelope were so placed as to indicate that they had been purposefully concealed. The envelope contained, among other items, 101 dishonored checks which had been returned to Citizens by Indiana National as uncollected but not returned to nor charged against the customers involved.

An inventory of the items revealed that (1) 13 checks had previously been charged off by Citizens, (2) nine checks had been identified through the certified public accountants' special audit and had been collected from the respective drawers by Citizens, (3) 11 checks were collected from the drawers by Citizens after the envelope was found and (4) 68

checks, totaling $25,195.68, had become uncollectible because of the passage of time.

Citizens brought suit on the blanket bond. The district court without a jury found for Citizens and entered a judgment for $25,195.68 plus $2,500 for the special audit (it found that "the need for the special audit was thus occasioned solely by the defalcations of Fred Gross" in concealing the records) and $1,000 for attorneys' fees incurred in efforts to mitigate damages, or a total judgment of $28,695.68, which is the subject of this appeal.

After the location of the ledger and the dishonored checks, it became possible to reconstruct what occurred but not why it occurred.

When Indiana National was unsuccessful in collecting out-of-town items for Citizens, it would promptly return the items to Citizens addressed to the attention of Gross or, if not so addressed, delivered to Gross because all mail from Indiana National or other corresponding banks was delivered to Gross by other bank employees as a matter of practice. Each returned check had a notation slip attached showing why it had been dishonored. Each mailing from Indiana National of a group of dishonored checks was accompanied by a "debit return" letter, in duplicate, listing all checks returned and requesting the signing and returning to Indiana National of one copy of the letter.

For some unexplained reason, Gross began to ignore the debit returns. He failed to send back the duplicate letters acknowledging receipt of the items, he failed to reflect promptly the changes in the Citizens–Indiana National account, and most importantly from Citizens' point of view, he failed to charge back customers' accounts or to obtain reimbursement from customers for these items. The effect of this was that Citizens bore the loss resulting from the bad checks, rather than Citizens' depositers who had originally accepted them from the drawers.

Most of the 68 checks were for reasonably small amounts, but one was in the amount of $19,176. A recitation of its history is illustrative of the other 67.

On July 13, 1967, Overhead Door Corp., a customer of Citizens, endorsed and deposited a check drawn by Porcelain Buildings, Inc. on Mercantile National Bank of Dallas for $19,176. Citizens forwarded the check to Indiana National which sent it to the drawee bank, which in turn refused payment because of insufficient funds. The check came back through the same channels and reached Citizens on July 20, 1967. On that same day, an Indiana National employee telephoned Gross and told him that the check had been dishonored and to watch for its arrival.

As of July 31, 1967, Agnes Schweier, Gross' assistant cashier and head bookkeeper, made the reconcilement to show the $19,176 debit. It was her duty to report the discrepancy to Gross and normally she would do so. But Citizens' books and records did not reflect the $19,176 discrepancy.

When Gross failed to acknowledge receipt of the debit letters, Indiana National sent out "tracers" which were ordinarily delivered to Gross. Subsequent bank statements from Indiana National would also reflect the discrepancy and these were also received by Gross.

Although the reconcilement ledger and dishonored checks were not found until January 7, 1970, the special audit made shortly after Gross' suicide on August 26, 1968, eventually revealed the fact that the $19,176 check had never been charged back to Overhead Door Corp. On January 15, 1969, Citizens' attorneys attempted to collect from Overhead Door, which denied liability. Meanwhile, Porcelain Building, Inc. went into bankruptcy.

When the manila envelope was found, it contained the check for $19,176 and the 100 other dishonored checks, as well as the debit return letters from Indiana National for July 20, 1967 and other dates, and the tracers sent out by Indi-

ana National. The reconcilement ledger when found showed that the page as of July 31, 1967 was in the handwriting of Agnes Schweier; there was no page for August, 1967; the pages for September 30, October 31, November 30 and December 31, 1967 were headed in Gross' handwriting but were otherwise blank; the pages from January through July of 1968 contain numerous entries and were in Gross' handwriting. A great number of these entries were false or "plugged," which means an arbitrary figure was inserted to balance an account. In addition to the false entries being in Gross' handwriting, sometime prior to his death and hence prior to the finding of the ledger, Gross admitted to the president of the bank that he had been "plugging" reconcilement entries.

There was no evidence that Gross profited from his failure to protect Citizens from the losses sustained, nor is there any direct evidence as to any possible motive for his delinquency. For these reasons, Transamerica seeks reversal of the lower court judgment, claiming that Gross may have been negligent but he was not dishonest, and that if no dishonesty is shown the blanket bond does not by its terms apply.

■ The words "dishonest" and "fraudulent" used in reference to conduct covered by a fidelity bond are to be given a broad meaning. Irvin Jacobs & Co. v. Fidelity & Deposit Co., 202 F.2d 794, 798 (7th Cir. 1953); Federal Deposit Ins. Corp. v. Aetna Casualty and Surety Co., 426 F.2d 729, 737 (5th Cir. 1970); Citizens' Trust & Guaranty Co. v. Globe & Rutgers Fire Ins. Co., 229 F. 326, 330 (4th Cir. 1915).

■ Misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct. Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co., *supra* at 737; National Surety Corp. v. Rauscher, Pierce & Co., 369 F.2d 572 (5th Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456 (1967); Maryland Casualty Co. v.

American Trust Co., 71 F.2d 137 (5th Cir.), cert. denied, 293 U.S. 582, 55 S.Ct. 95, 79 L.Ed. 678 (1934).

In American Surety Co. v. Jay Lodge, 102 Ind.App. 82, 92–93, 196 N.E. 356, 361 (1935), the Indiana court defined dishonesty as "[a] want of integrity in principle; a want of fairness and straightforwardness; a disposition to defraud, deceive or betray; faithlessness, or a course of conduct generally characterized in the common speech of men as lacking in principle."

■ It would appear that the evidence of Gross' fraudulent entries in and "plugging" of the reconcilement ledger and his concealment of the ledger and the dishonored checks would alone be sufficient evidence of dishonesty within the accepted definitions.

■ Moreover, it is not necessary that the employee covered by the bond personally profited by his acts. Irvin Jacobs & Co. v. Fidelity & Deposit Co., *supra* at 798; Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co., *supra* at 737; Brandon v. Holman, 41 F.2d 586, 588 (4th Cir. 1930).

In London & Lancashire Indemnity Co. of America v. Peoples Nat. Bank & Trust Co., 59 F.2d 149, at 152 (7th Cir. 1932), an Indiana bank sued on a bond for the dishonest acts of one of its employees who, like Gross, had been the cashier and later vice president. In affirming a judgment for the bank, this court said:

"To warrant recovery under such a bond, the 'dishonest act' of an employee, as mentioned in the bond, need not be such as would involve criminal liability of the employee for its commission. United States Fidelity & Guaranty Co. v. Bank of Thorsby, 46 F.2d 950 (C.C.A. 5); Citizens' Trust & Guaranty Co. of W. Va. v. Globe & Rutgers Fire Ins. Co., 229 F. 326, Ann.Cas.1917C, 416 (C.C.A. 4); Aetna Casualty & Surety Co. v. Commercial State Bank, 13 F.2d 474 (D.C. Ill.); World Exchange Bank v. Commercial Casualty Ins. Co., 255 N.Y. 1,

173 N.E. 902; National Surety Co. v. Williams; 74 Fla. 446, 77 So. 212. If it indicates a reckless, wilful, and wanton disregard for the interest of the employer—if it be an act manifestly unfair to the employer and palpably subjects him to likelihood of loss—a fact question of liability for loss thereby ensuing, as from a dishonest act, is fairly raised.

"With this positive knowledge on Maple's part that Bolinger and his bank were wholly unworthy of credit for any amount whatever, in our judgment the evidence fairly raised a jury question as to whether Maple had acted honestly toward his bank in consenting, directly or indirectly, to this further credit to Bolinger or his bank. United States Fidelity & Guaranty Co. v. Bank of Thorsby, supra; World Exchange Bank v. Commercial Casualty Ins. Co., supra." [4]

There can be little doubt that Gross' acts, however motivated, were "manifestly unfair" to Citizens and subjected it to loss.

 However, Transamerica has argued that the acts of Gross, which seem to fall clearly within the judicial definitions of dishonesty, occurred after the loss was sustained by Citizens [5] and were simply part of Gross' efforts to cover up his prior negligence. The evidence supports a finding that the dishonesty occurred from the inception of Gross' activities.

Thus even if a mere failure to act on receipt of the dishonored checks and accompanying debit return letters might only support a finding of negligence, here, at least in connection with the

Overhead Door Corp. check, Indiana National Bank telephoned Gross to inform him of its uncollectibility, so that, coupled with the stringency of banking procedure relating to uncollected checks, Gross' conduct could be found to be more than negligent. Moreover, repetition of the failure to charge back points to callousness and not carelessness.

The fact that Gross may have plugged the reconcilement ledger and concealed it and the dishonored checks at a later time does not compel acceptance of that time as the first time that dishonest acts occurred. Although Citizens' rights against drawers were apparently prejudiced even if the cover-up occurred later, the evidence is sufficient to sustain the district court's finding that Citizens "has suffered a loss as the result of the dishonest acts of Mr. Gross" and that dishonesty occurred at the outset of those acts contemporaneously with negligence.

In the light of these facts and the principles to be applied, there can be no doubt that the district court's findings that Gross' actions and conduct constituted dishonest acts under the terms of the blanket bond were not clearly erroneous and must stand. Fed.R.Civ.P. 52(a). The requisite findings were also made to justify inclusion in the judgment of $2,500 for the special audit, Stone v. Mattes, 170 So.2d 120 (La.App. 1964), and $1,000 for attorneys' fees as expenses resulting in mitigation of damages, Chicago, I. & L. Ry. Co. v. Woodward, 164 Ind. 360, 72 N.E. 558 (1904); Pennsylvania Co. v. Dolan, 6 Ind.App. 109, 32 N.E. 802 (1892).

The judgment for Citizens in the amount of $28,695.68 is affirmed.

4. See also, Irvin Jacobs & Co. v. Fidelity & Deposit Co., *supra* at 798, for this court's holding that whether an employee's acts constitute dishonesty within the meaning of the terms of a bond is a fact question.

5. Under Indiana law, the right to charge back against the customer's account must be exercised by midnight of the day following the return of the check or within a reasonable time after the bank learns the facts. Burns' Indiana Statutes Annotated, § 19–4–212(1), IC 1971, 26–1–4–212(1).