The ROCK ISLAND BANK,
Plaintiff-Appellee,

v.

The AETNA CASUALTY AND SURETY COMPANY, Defendant-Appellant.

No. 82–1304.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1982.

Decided April 28, 1983.

Rehearings and Rehearing En Banc

Denied Sept. 7, 1983.

Gary L. Griffin, McNeela & Griffin, Ltd., Chicago, Ill., for defendant-appellant.

Michael J. O'Rourke, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

Before POSNER, Circuit Judge, COFFEY, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

This appeal challenges the district court's entry of summary judgment for the plaintiff-insured on a blanket bond issued by the defendant-insurance company. The appellant, Aetna Casualty and Surety Company

* The Honorable William J. Campbell, Senior District Judge for the United States District Court for the Northern District of Illinois, is sitting by designation.

(Aetna) claims that a material issue of fact exists as to whether the acts of William Kearney, a past president of the Rock Island Bank (Rock Island), were dishonest or fraudulent within the meaning of the bond. Kearney had issued letters of credit to Cortland J. Silver in amounts which greatly exceeded his loan authority without consulting the loan committee of the bank. Subsequently, Silver declared bankruptcy and one of the outstanding letters of credit resulted in a judgment against Rock Island for $371,181.71. Upon Rock Island's Motion for Summary Judgment, the district judge concluded that the losses incurred by Rock Island arising out of those letters of credit, i.e. the judgment and attorneys fees, were covered by the blanket bond. Based on that determination, the district court entered a judgment against Aetna for $532,-914.21 and the defendant brought this appeal.

The decision in this case turns not on specific factual disputes as to the substance of the relevant transactions, but on the proper inferences to be drawn from those facts. The district court made extensive findings of fact with which we and the parties find no fault. Therefore, we will quote that portion of the Summary Judgment Order, subject to subsequent supplementation. (The District Judge's footnotes are included in brackets in the body of the quotation.)

1. During the period April 14, 1968 through April 9, 1970, The Rock Island Bank was insured under two Bankers' Blanket bonds issued by The Aetna Casualty and Surety Company. These bonds insured The Rock Island Bank, *inter alia,* against losses resulting from dishonest or fraudulent acts committed by any covered employee.

2. Throughout the aforesaid period, William J. Kearney was President of the Rock Island Bank and was an employee covered by the bonds.

3. During the period April 14, 1968 through April 9, 1970, Mr. Kearney issued seven letters committing The Rock Island Bank to assume loans made to, or to honor drafts drawn to the account of, Cortland J. Silver and/or one or more of his corporate enterprises, as follows:

| Date | Institution to Which Issued | Amount | Exercise Date |
|------|------------------------------|--------|---------------|
| 4/4/68 | National Bank of North America | $300,000 | after 4/5/71 |
| 4/25/68 | National Bank of North America | $300,000 | until 4/25/69 |
| 9/12/68 | O'Hare International Bank | $350,000 | 1/2/73 through 3/1/73 |
| 4/17/69 | National Bank of North America | $300,000 | until 4/19/70 |
| 6/5/69 | Lorraine Realty Corp. (subsequently assigned to Bank of North Carolina, N.A.) | $400,000 | after 6/5/71 |
| 1/15/70 | America Bank & Trust Co. | $350,000 | until 2/1/72 |
| 4/9/70 | National Bank of North America | $300,000 | after 4/5/71 |

4. The aggregate amount of such commitments was at least $1,700,000 and may have totalled $2,000,000.*

5. The only direct monetary consideration received by The Rock Island Bank for the issuance of the letters of commitment was $1,500.00 received in June, 1968.

6. Mr. Kearney issued the letters of commitment without disclosure to, or the approval of, The Rock Island Bank's Board of Directors or its Loan Committee.

7. Prior to and during the time Mr. Kearney was issuing the letters of commitment, two resolutions of The Rock Island Bank's Board of Directors were in force and effect. One resolution, adopted on January 21, 1963, set certain limits on the lending authority of individual officers and also contained the following language:

"Irrespective of amount and anything herein to the contrary notwithstanding, all loans of an unusual nature, due to terms, borrower, type of collateral, or other exceptional feature, shall be made only with the approval of the Loan Committee."

The second, issued August 8, 1968 read in part as follows:

"The Chairman of the Executive Committee, the President, the Executive

Vice President and the Vice President in the loan division have authority to make $50,000.00 marketable collateral loans, and $25,000,00 unsecured loans individually, and above $25,000.00 to $75,000.00 jointly by any two of them. Beyond this, loans secured or unsecured to $100,000.00 may be extended with the approval of any two of the following officers: The Chairman of the Board, the Chairman of the Executive Committee, the President or the Executive Vice President. Other loans must have approval of the loan committee." * *

8. Prior to April 4, 1968, Mr. Kearney had never seen or issued a letter of credit.

9. The Kearney-issued letters of commitment were not reflected in the Bank's books of account, nor were they disclosed to bank examiners of the Illinois Commissioner of Banks and Trust Companies or the Federal Reserve Bank during those respective agencies' examinations of The Rock Island Bank of August 4, 1969 and January 19, 1970.

10. The Rock Island Bank was notified of the existence of the Kearney letters of commitment through an investigation of The Rock Island Bank conducted by the Federal Reserve Bank on May 26–27, 1970. Thereafter, it was determined that, as of July 3, 1970, the amount of outstanding Kearney-issued letters of commitment was $1,050,000.00.

11. Notice of possible claims under the bonds was made by the Bank to Aetna on July 3, 1970.

12. On March 14, 1976, The Rock Island was sued by the Bank of North Carolina, N.A. on the letter of commitment dated June 5, 1969 to Lorraine Realty Corp., described in paragraph 3 above. The Bank promptly tendered defense of the suit to Aetna. Aetna refused defense by letter of May 14, 1976.

12. [sic] The Bank filed a timely proof of loss with Aetna on March 31, 1976, covering the letter of commitment dated June 5, 1969. The defendant refused demand. On December 16, 1980, judgment was awarded in the *Bank of North Carolina, N.A. v. The Rock Island Bank* litigation in favor of the Bank of North Carolina and against The Rock Island Bank in the amount of $371,181.71, plus costs of suit.

12. [sic] In the course of the defense of the Bank of North Carolina litigation and in resisting various demands for payment by the holders of the other Kearney-issued letters of commitment, The Rock Island Bank expended $129,149.47 in attorneys' fees, the amount of which is not in dispute.

* [The April 17, 1969 commitment appears to have replaced the April 25, 1968 commitment. It is unclear whether the April 9, 1970 commitment replaced the April 4, 1968 commitment.]

* * [Prior to August 8, 1968, the lending authority of individual officers for marketable collateral loans was only $25,000, and the limit for unsecured loans was only $5,000.]

Some additional and apparently uncontested facts should also be noted. In 1968, when Silver was introduced to Kearney as a potential client for the bank, he was highly recommended as an active businessman with substantial interests and connections. Kearney checked Silver's credit background with two other banks, the First Wisconsin Bank and the First National Bank of St. Paul. First Wisconsin informed him that Silver had an open line of credit with them of $100,000. In a memorandum dated January 17, 1968 to the Rock Island loan committee, Kearney stated:

"The First National Bank has advanced to Mr. Silver three and one-half million dollars in construction funds which will be repaid from permanent financing committed to by the Massachusetts Mutual Insurance Company."

Kearney requested and received from Silver a personal financial statement, the accuracy of which has not been questioned, which indicated that his net worth was approximately $5,000,000.[1] Mr. Silver was a desirable client to the bank not only for his

1. Kearney also obtained a financial statement of John Bouthilet, Silver's business associate, which indicated that his financial stature was similar to Silver's.

wealth and contacts but also because his expressed intentions to invest in the Rock Island area coincided with the bank's desire to increase loan demand through regional development. The loan committee authorized a loan of $200,000 to be made to Silver and encouraged Kearney to develop and maintain a relationship with him. During his relationship with the bank, Silver arranged for approximately $660,000 to be deposited in the bank by third parties. However, he never did invest in the Rock Island area and in 1975 he declared bankruptcy.

There is no evidence that Kearney ever received any personal compensation for his issuance of the letters or that he had any interest in the business ventures benefitted by them. While it is admitted that Kearney did not inform the loan committee of the letters of credit, there is no evidence of active concealment. Kearney's secretary typed the necessary documents and files on the transactions were kept in the bank and were not secreted in any way. Mr. B.T. Olson, cashier and officer of the bank, attested the June 5, 1969 letter of credit for $400,000 (which eventually resulted in the judgment against Rock Island) and Howard Peterson, executive vice president of Rock Island, attested the January 15, 1970 letter of credit for $350,000. Kearney testified that there were always two or three people in the bank aware of any of the transactions.

Based on the facts quoted above, the district court concluded that Kearney's conduct in issuing the letters of credit was dishonest or fraudulent within the meaning of the bond. The court determined that summary judgment was appropriate because:

> In situations such as this, where there is no issue as to the acts committed by an employee covered by Bankers' Blanket bonds, it is proper for the Court to determine whether or not such acts constitute "dishonest or fraudulent act(s)" within the meaning of such bonds. Summary Judgment Order pps. 4–5, Feb. 5, 1982, citing *First National Bank of Clinton v. Insurance Company of North America,* 606 F.2d 760, 768 (7th Cir.1979).

While the *First National Bank* opinion does contain language to that effect, that case involved a situation in which there was unrebutted direct evidence of dishonest conduct by the bank president, i.e., admitted conversion of bank funds to personal use, knowing utilization of forged documents and false information in prohibited loan transactions. Thus, in that case there was no material issue as to the nature of the employee's conduct, *see Citizens State Bank v. Transamerica Insurance Company,* 452 F.2d 199, 203 (7th Cir.1971) ("Misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct."). Under those circumstances, the Court in *First National Bank* noted that the only remaining issue was the construction of the bond, a question of law. Therefore, summary judgment in that situation was appropriate.

■ The characterization of the employee's conduct, however, is a question of fact, *Central National Life Insurance Company v. Fidelity & Deposit Co. of Maryland,* 626 F.2d 537, 541 (7th Cir.1980); *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland,* 202 F.2d 794, 798 (7th Cir.1953). Willfulness and an intent to deceive must be present in order for an employee's actions to be dishonest or fraudulent, *Eglin National Bank v. Home Indemnity Co.,* 583 F.2d 1281, 1285 (5th Cir.1978); *Arlington Trust Co. v. Hawkeye-Security Insurance Co.,* 301 F.Supp. 854, 858 (E.D.Va.1969); *see also* 13 Couch on Insurance 2d § 46:55 (and cases cited therein). The conduct of the employee need not involve criminal liability nor result in personal profit; however, mere negligence, incompetence, or error in judgment is not sufficient, *Central National Life Insurance Co. v. Fidelity & Deposit Co. of Maryland,* 626 F.2d at 542.

■ In the case *sub judice,* there is no unequivocal evidence of deception. The district court noted, and the appellee emphasizes, that the letters of credit were not reflected in Rock Island's books of account and therefore were not disclosed to state and federal bank examiners. Kearney's explanation for this omission was that he did

not believe that any record needed to be made at the time of issuance because there was no imminent disbursal of funds.[2] Rock Island characterizes this statement as disingenuous, which it might be, however questions of credibility are not properly resolved on summary judgment. The district court did note that Kearney had never seen or issued a letter of credit prior to dealing with Silver and the bank had no procedures for processing them. Records of the transactions with Silver were prepared by Kearney's secretary and were not secreted in any manner. Furthermore, at least two of the letters were issued with the knowledge of another bank officer. Thus, for purposes of summary judgment, the direct evidence of deception was slight and equivocal.

The district court inferred dishonesty from Kearney's conduct, finding that he had exceeded his lending authority in issuing the letters, disregarded the interests of the bank, and recklessly exposed the bank to a substantial risk of loss. The bank contends that the summary judgment can be upheld simply on the finding that Kearney knowingly exceeded his lending authority, relying on *Arlington Trust Co. v. Hawkeye-Security Ins. Co.,* 301 F.Supp. 854 (E.D.Va.1969) and *Miami National Bank v. Pennsylvania Ins. Co.,* 314 F.Supp. 858 (S.D. Fla.1970) in which the Court stated:

> Knowingly making unauthorized loans is such a breach of trust as will constitute fraud or dishonesty within the meaning of the [blanket] bonds. 314 F.Supp. at 863.

However, there is authority to the contrary:

> In the absence of a loan fee, or other evidence of dishonest purpose, we do not characterize as dishonest those loans as to which the only evidence of misconduct is the fact that the loan exceeded in amount the bank's lending limit for individual borrowers. Although such loans are in violation of banking regulations, as we noted in our order of January 16, 1975, "[v]iolation of statutes relating to the operation of banks would not establish dishonesty *per se.* The conduct itself must be judged by the standard for dishonesty [previously set forth by the court]." *Fidelity Savings & Loan Assoc. v. Aetna Life & Casualty Co.,* 440 F.Supp. 862, 874 (N.D.Cal.), *aff'd* 647 F.2d 933 (9th Cir.1981).

*See also* 9A Appleman on Insurance (Rev. Ed.1981) § 5709 ("If a bank employee has violated his instructions or rules in making loans, but he has acted in good faith throughout, it has been held that he is not liable therefor on his bond." [Citations omitted.]) We believe that each case must be analyzed on its own facts and a *per se* rule that unauthorized loans are dishonest is unwarranted. A person may exceed his or her authority without a dishonest purpose, *see e.g., Fidelity & Deposit Co. of Maryland v. Peoples Bank of Sanford,* 72 F.2d 932 (4th Cir.), *cert. den.* 293 U.S. 627, 55 S.Ct. 348, 79 L.Ed. 714 (1934), and while the terms of the bond should be broadly construed, there is no justification for extending coverage to all unauthorized acts, *see Central National Life Insurance Co. v. Fidelity & Deposit Co. of Maryland,* 626 F.2d at 544.[3]

While we do not accept the broad rules stated in the *Arlington Trust* and *Miami*

---

**2.** Kearney also utilized this rationale to explain his failure to inform the loan committee of the issuance of the letters. In addition, he stated *that he did not consider the letters of credit to be loans* and thus they were not addressed by the bank's resolutions on the lending authority of officers.

**3.** In *Central National Life Insurance Co. v. Fidelity & Deposit Co. of Maryland,* 626 F.2d 544, the issue before the court was when the loss resulting from the dishonest or fraudulent acts was discovered by the insured. The insured was a life insurance company that sustained

losses when an employee, Leon Clough, established unreasonably low rates for certain group policies and granted excessive commissions to agents in return for kickbacks. The court stated:

> [T]he officers [of Central National Life Insurance Company] knew than [sic] Clough had quoted and issued one or more policies at rates appreciably lower than the manual or without checking with the actuary. Likewise, they knew that rates in some instances had been guaranteed beyond the period of 12 months contrary to instructions, as well as the fact that excessive commissions had been

*National* cases, we do not think that, limited to their facts, those cases are irreconcilable with our position. The facts in both of those cases involved indices of dishonesty which the present case does not. In *Miami National,* the employee was in charge of the Installment Loan Department and knowingly exceeded his loan authority and concealed it by altering bank records and using "straw men" as nominal borrowers. Additionally, he made these excessive loans to a corporation that he knew had virtually no assets and he received certain favors of value in return. After a non-jury trial, the district court concluded that the losses caused by the employee's conduct were covered by the "dishonest or fraudulent" provision of the blanket bond.

In *Arlington Trust,* the employee engaged in a pattern of conduct designed to conceal collection problems in his department. He prepared financial reports with the past due balances omitted and prevented some renewal notes from being recorded on the bank's daily journal sheets. He also issued renewal loans without authority and permitted some borrowers to process their own loan papers. He authorized loans in excess of the approved line of credit and in some cases where there was no approved credit rating. After a non-jury trial, the court concluded that the making of the unauthorized loans constituted a breach of trust and that the necessary element of the intent to deceive was satisfied by the evidence of false reports and the withholding of information. The court also relied on the employee's conduct in permitting the borrowers to process the paperwork for their own loans as evidence of reckless disregard for the bank's interest.

Initially we note a significant procedural distinction between this case and the *Miami National* and *Arlington Trust* cases. This case was decided on summary judgment while *Miami National* and *Arlington Trust* were decided after a non-jury trial. Thus, the district judges in those cases were not constrained by the restriction applicable to summary judgment cases that all reasonable inferences to be drawn from the facts must be drawn in favor of the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cedillo v. International Ass'n of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7 (7th Cir.1979). Additionally, the fact finders in those cases were free to make credibility determinations which, of course, are not a proper subject of resolution on summary judgment, *see Eisbach v. Jo-Carroll Elec. Co-op., Inc.,* 440 F.2d 1171 (7th Cir.1971), Advisory Committee Notes to Rule 56 (1963 Amendment).

Another significant distinction is that the evidence of deceptive conduct in this case is not great nor is it unequivocal, *see discussion supra.* Furthermore, we do not believe that the district court's inference of dishonesty is the only reasonable inference which can be drawn from the undisputed facts. The court found that Kearney had disregarded the interests of the bank in issuing the letters of credit. However, unlike the *Miami National* case, there is no evidence that Kearney had personally profited from the prohibited transactions. While that fact is not conclusive on the question of dishonesty, it is certainly relevant to the issue of whose interest he was serving. Mr. Silver was a prominent businessman who expressed an interest in investing in the Rock Island area and that made him a desirable customer of the bank.[4] The board

awarded to agents. However, they had no intimation that Clough was engaged in any dishonest or fraudulent activity until the series of Risken checks, payable to Clough, came to light on December 9, 1972.

\*　　\*　　\*　　\*　　\*　　\*

*While Clough, according to the depositions submitted, was clearly guilty of certain "wrongdoings" as urged by Fidelity, the policy does not provide coverage for "wrongdo-*

*ing". Is every "wrongdoing" a dishonest or fraudulent act within the meaning of the policy? We think not,* and doubt whether Fidelity would ever agree that "wrongdoings" are covered under the policy. [Emphasis supplied.]

4. The appellee argues that this consideration is irrelevant because Silver never did invest in the Rock Island area. The record did not reveal whether Silver did not invest in the Rock Island

of directors of Rock Island was aware of Kearney's relationship with Silver and encouraged him to develop it. While the only direct consideration that Silver made to the bank was the $1,500 fee, he did arrange for sizeable sums of money to be deposited in Rock Island.[5] Thus, there is some evidence that Kearney was acting in the interest of the bank.

The district court also determined that Kearney's conduct recklessly exposed the bank to a substantial risk of loss. This finding was apparently based on the great amount of money represented by the letters of credit and the fact that Silver was eventually unable to satisfy all of the obligations. There is no allegation that Kearney failed to make a proper credit investigation of Silver, nor has the accuracy of Silver's net worth statement been put at issue. Plaintiff had made no showing that Kearney issued any of the letters of credit with knowledge of Silver's impending financial demise. Therefore, unlike both *Miami National* and *Arlington Trust,* there has been no showing that, at the time of the transactions, the employee knew that the financial condition of the borrower was such that the credit being extended was unreasonable.[6]

In summary, we do not believe that the undisputed facts are of a sufficient character to compel, as the only reasonable inference, the conclusion that Kearney's actions were dishonest or fraudulent within the meaning of the bond. There has been no showing of self-interest or bad faith on the part of Kearney, and the circumstantial evidence is equivocal. While the facts are susceptible to an inference of dishonesty,

one could also reasonably infer that the loss was due to errors in judgment, incompetence, and/or negligence. Since the case was before the court on plaintiff's motion for summary judgment, the latter inference should have been made and the motion denied. Accordingly, the judgment of the district court is reversed and the cause remanded for proceedings consistent with this opinion.

REVERSED.

---

area because his deteriorating financial condition did not permit it, or whether he never had any intention of doing so. More importantly, there is nothing in the record to suggest that Kearney (or the directors of Rock Island) knew whether Silver did not intend to follow through on his stated plans.

5. The bank attempts to minimize the significance of these deposits by noting that the deposits were not pledged for Silver's debts and could have been withdrawn at any time. The appellee also notes that this practice of "brokered deposits" can be very dangerous to a bank. However, there is no evidence that the

funds were withdrawn inopportunely and thus, despite the potential for harm, none has been demonstrated. Therefore, while the deposits were not pledged for Silver's debts, we must conclude that the bank benefited from them.

6. We note that despite the issuance of numerous letters of credit to Silver, the bank was only required to satisfy the debt represented by one of them, i.e. the letter of credit dated June 5, 1969. Additionally, the amount originally represented by that letter, $400,000, had been reduced by Silver to approximately $235,000.