FIRST TEXAS SAVINGS ASSO-CIATION, Plaintiff–Appellee,

and

First Gibraltar Savings Association, FSB, Intervening Plaintiff–Appellee,

v.

RELIANCE INSURANCE CO., Defendant–Appellant.

No. 90–1641.

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1992.

Rehearing Denied Feb. 21, 1992.

James A. Knox, Stephen L. Baskind, Michael D. Farris, Vial, Hamilton, Koch & Knox, Dallas, Tex., Joe R. Greenhill, Baker & Botts, Austin, Tex., for defendant-appellant.

Bart Wulff, Sarah L. Scharnberg, Frederick Bartlett Wulff, Sr., Cohen, Simpson, Cowlishaw, Aranza & Wulff, Clarice M. Davis, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for plaintiff-appellee.

Before POLITZ, Chief Judge,
REAVLEY, and JOLLY, Circuit Judges.

REAVLEY, Circuit Judge:

Reliance Insurance Company (Reliance) appeals from an $8.4 million judgment in favor of First Texas Savings Association (First Texas) and First Texas' successor in interest, First Gibraltar Savings Association, FSB. The judgment is based on a jury's findings that First Texas suffered a loss covered by a standard form Savings and Loan Blanket Bond (the Bond) that Reliance issued to First Texas on July 9, 1984, and that Reliance engaged in unfair or deceptive insurance practices in its treatment of First Texas' claim. We vacate that judgment. Because we find that the Bond's "Loan Exclusion clause" excludes coverage of First Texas' loss, we hold that Reliance is not liable on the claim under the Bond. On the extra-contractual claims, we remand the case for a new determination of Reliance's liability for unfair or deceptive practices.

## I. BACKGROUND

First Texas suffered the disputed loss as a result of a series of transactions by one of its customers, Norman Rosenstein, who maintained several accounts, certificates of deposit, and mortgage loans at First Texas' Forest Meadow branch. Rosenstein represented to First Texas and to other banking institutions that he was extremely wealthy and that he required special attention to conduct his real estate and securities trading businesses. First Texas' employees believed these representations and provided Rosenstein with special privileges that included immediate access to funds from deposited checks and a "pay-all" computer code that allowed Rosenstein to draw on his accounts even when the funds in those

accounts were insufficient to cover the withdrawals. When employees at First Texas' Item Processing Department received an item which, if honored, would create an overdraft in Rosenstein's account, they contacted Martha Rozell, the manager of the Forest Meadow branch. Rozell regularly authorized the acceptance of the item and then contacted Rosenstein, who either approved a transfer of funds from another account or delivered a deposit to cover the amount of the overdraft. Under this arrangement, Rosenstein's accounts incurred, and Rosenstein ultimately covered, hundreds of overdrafts totalling millions of dollars from 1982 to 1984.

Contrary to the beliefs of those at the Forest Meadow branch, as well as those of the employees at the other institutions where Rosenstein had accounts, Rosenstein was not the wealthy and legitimate businessman he purported to be. Instead, he was running a check-kiting scheme that allowed him to use the banks' money to finance major securities investments.[1] Rosenstein was able to keep the kite flying as long as the banks continued to give him immediate credit on his deposited checks. On at least two occasions, however, one in April 1984 and the other in July 1984, Rosenstein deposited checks in his First Texas accounts, and the banks on which the checks were drawn returned them to First Texas unpaid. This caused Rosenstein's kite to collapse, resulting in overdrafts in Rosenstein's First Texas accounts of approximately $1 million in April and $3 million in July. First Texas contacted Rosenstein regarding these overdrafts, and he quickly covered them with large deposits. The returned checks were never honored by the drawee banks. Although Rosenstein's ability and willingness to cover

these overdrafts enhanced Rozell's confidence in Rosenstein's wealth and legitimacy, Rosenstein actually raised these funds by liquidating stock holdings that he had acquired with money kited from First Texas to begin with. Following the July overdraft, Rosenstein met with Rozell and her superior, Brian Doran, at First Texas' offices, and assured them that he had no intention of allowing First Texas to suffer a loss on his accounts. Two of First Texas' officers suggested to Rozell that Rosenstein was kiting and that she should close his accounts or First Texas would "get burned," but Rozell trusted Rosenstein and allowed him to retain his special privileges.

In November 1984 Rosenstein's kite crashed. Betting that the re-election of former President Reagan on November 6 would stimulate growth in the stock market, Rosenstein made numerous fake deposits in his First Texas accounts and, taking advantage of his immediate access to those funds, withdrew the money by checks, wire transfers, and cashiers checks and invested it in securities. Rosenstein bet wrong, however, and lost over one million dollars on November 7 and another million the following day. Hoping to quickly recoup these losses, Rosenstein continued to purchase options with checks drawn on his First Texas accounts. In all, Rosenstein made withdrawals based on fake deposits of over $10 million. Finally, when he realized that he would be unable to recover his losses and thus unable to cover the overdrafts that the returned deposits would create, Rosenstein instructed First Texas to stop honoring his checks. Rosenstein repaid some money before he was sentenced on criminal bank fraud charges, but First Texas ultimately suffered a com-

---

**1.** A check-kiting scheme, as this court has previously explained,

is a process whereby a person with a checking account in two banks can create an illusion of money in his accounts. A check drawn on the first bank is deposited with the second bank. Before the check reaches the first bank for payment, a check drawn on the second bank is deposited in the first bank. If the bank is willing to give credit in the interim, and many banks are if the person is a regular

customer, the person can use the bank's money without first providing collateral and without paying interest. The scheme can go on as long as the person keeps on depositing checks in both banks and as long as the banks believe that there is money behind the checks.

*Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co.,* 533 F.2d 290, 294 n. 3 (5th Cir.), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

bined loss of over $3.6 million in four separate Rosenstein accounts.

First Texas filed a notice of the November loss with Reliance on December 12, 1984, and a proof of loss in February 1985, seeking coverage under "Agreement (B)" of the Bond, which protects against "On Premises" losses. Reliance's claims manager, Mike Hudson, initially believed this to be a typical check-kiting loss and suggested to First Texas that the amount Rosenstein withdrew by cashiers checks—approximately $2 million—was covered. Reliance then began an audit of Rosenstein's accounts. At trial, First Texas argued, and the jury believed, that Reliance began a concerted effort to delay or deny payment of this claim so that it could avoid relying on its own reinsurance policy. At one point Hudson suggested that Reliance "stiff arm" First Texas until the audit was completed. Reliance also hired an investigator, Norman Roth, to audit First Texas' records and attempt to find a way to reduce Reliance's exposure. First Texas presented evidence that Roth misled First Texas during the course of his investigation.

Ultimately, Reliance discovered a letter that Rozell wrote explaining the events surrounding the April and July overdrafts. In a meeting with First Texas' representatives on February 12, 1986, Hudson denied the claim on the grounds that First Texas' employees knew of and assisted in Rosenstein's kiting scheme. When First Texas' representatives suggested that the loss should still be covered under "Agreement (A)" of the Bond (dealing with losses caused by employee dishonesty and fraud), Hudson reiterated Reliance's denial of the claim and walked out of the meeting. First Texas later requested a written explanation of the denial but Reliance never provided one. This suit followed.

■■■ Reliance moved for a summary judgment that the Bond does not cover First Texas' loss, but the district court denied the motion and the case went to

trial. The jury found that the Bond's "On Premises" agreement does cover First Texas' losses from the cashiers checks, totalling $1,785,000, but does not cover the losses resulting from the wire transfers or checks. The jury then found that Reliance breached its common law duties of good faith and fair dealing, and awarded actual damages of $375,000 but no exemplary damages. The jury also found that Reliance engaged in unfair or deceptive practices that caused First Texas actual damages of $600,000 recoverable under Tex.Ins. Code Ann. art. 21.21, § 16 (Vernon Supp. 1991). Finally, the jury awarded First Texas $700,000 in attorneys fees. First Texas elected to recover its extra-contractual losses under article 21.21 rather than under the common law cause of action. The district court reduced the $1,785,000 by the amount of the Bond's $150,000 deductible, added the article 21.21 damages of $600,000, and trebled the sum under article 21.21, § 16. It then added $999,058 in prejudgment interest and the $700,000 for attorneys fees and entered judgment in First Texas' favor for $8,404,058. On appeal, Reliance attacks the district court's judgment on both the contractual and extra-contractual claims.[2]

## II. DISCUSSION

### A. The Bond Coverage Issue

■■■ In Agreement (B) of the Bond, Reliance agreed to indemnify First Texas for "(1) Loss of Property resulting directly from ... (b) ... false pretenses ... committed by a person (i) present in an office of, or on the premises of, the Insured...." The jury found that this Agreement covered First Texas' loss of $1,785,000, suffered when First Texas issued five separate cashier's checks to Rosenstein's representatives on November 6, 7, 8, and 9. But Reliance contends that Section 2 of the Bond's Conditions and Limitations, the "Loan Exclu-

2. Reliance also appeals from the district court's denial of Reliance's motion for separate trials on the contractual and extra-contractual claims. A motion to bifurcate is a matter within the sole discretion of the trial court, and we will not reverse the court's decision absent an abuse of that discretion. *See Gonzalez–Marin v. Equitable Life Assur. Soc.*, 845 F.2d 1140, 1145 (1st Cir.1988). We find no abuse of discretion in the district court's refusal to bifurcate.

sion clause," excludes coverage for this loss as a matter of law. The Loan Exclusion clause provides:

> This bond does not cover ... (e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, ... whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses....

Reliance argues that the transactions that led to First Texas' loss fit within the meaning of "any loan or transaction in the nature of a loan or extension of credit" as used in this clause, and thus are excluded from coverage under the Bond. Our analysis of this issue begins with *Calcasieu–Marine Nat'l Bank v. American Employer's Ins. Co.*, 533 F.2d 290 (5th Cir.), *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).[3] In *Calcasieu–Marine*, this court decided two appeals involving rice companies whose banks provided them with immediate credit for documentary drafts deposited in their bank accounts. The rice companies' customers, however, dishonored the drafts, and the banks did not learn of this until the rice companies had closed. By then, the rice companies had drawn on the uncollected deposits, resulting in substantial negative balances when the drafts were not honored. *Id.* at 292–93. The banks sought coverage for these losses under their bankers blanket bonds, and the bonding companies argued that the losses were excluded by the bonds' Loan Exclusion clauses. *Id.* at 293.

The *Calcasieu–Marine* court recognized that a transaction may qualify as a "loan" under the Loan Exclusion clauses even in the absence of loan formalities such as promissory notes, *id.* at 297–98, and even when the bank does not intend to make a "loan." *Id.* at 299 n. 13. The court also set forth "the classic definition of a loan":

> A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

> "In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. *If such be the intent of the parties, the transaction will be considered a loan without regard to its form.*"

*Id.* at 296–97 (quoting *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir.1914)). Based on these principles, the *Calcasieu–Marine* court determined that the banks' grant of immediate access to funds represented by the deposited but uncollected drafts was a "de facto loan" to its customers, and thus the Loan Exclusion clauses excluded the resulting losses from coverage under the bonds. *Id.* at 298.

But in reaching this conclusion, the *Calcasieu–Marine* court distinguished earlier district court cases that held that "the loan exclusion clause does not apply to losses caused by check-kiting schemes." *Id.* at 294 n. 4. In one such case, *National Bank of Commerce v. Fidelity & Casualty Co. of New York*, 312 F.Supp. 71 (E.D.La.1970),

---

**3.** In support of its exclusion argument, Reliance relies first on *Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761 (Tex.1982), in which the Texas Supreme Court states that, under Tex.Bus. & Comm. Code § 4.401(a) (Vernon 1968), "[w]here a bank voluntarily pays a check as an overdraft, it makes a loan to its customer." *Id.* at 763 n. 2; *see also Williams v. Cullen Center Bank & Trust*, 685 S.W.2d 311, 312 (Tex.1985) (section 4.401(a) "entitles the bank to treat an overdraft as a loan by the bank, which carries with it an implied promise to repay"). Both *Bryan* and *Williams*, however, as well as section 4.401(a), concern overdrafts that are created when a bank honors

a customer's check even though the funds in the customer's account are insufficient. It is uncontested that First Texas extended this type of privilege to Rosenstein by furnishing him with the pay-all code. But much, if not all, of the losses in this case occurred when Rosenstein withdrew funds from an account that, because of recent deposits, showed a sufficient balance to cover the withdrawals. The overdrafts occurred when the deposits were returned unpaid after they had already been credited to Rosenstein's account. Under these circumstances, our analysis begins not with *Bryan* and *Williams* but with *Calcasieu–Marine.*

*aff'd*, 437 F.2d 96 (5th Cir.), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971), the court held that it was "not conceivable ... that any disinterested banker, insurance underwriter, or lawyer would construe the word 'loan' ... to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks." *Id.* at 75 (quoting *Hartford Accident and Indem. Co. v. Federal Dep. Ins. Corp.*, 204 F.2d 933, 937 (8th Cir.1953)). The *National Bank of Commerce* court held that the term "loan," as used in the bond, "does not include money advanced in good faith on worthless checks." *Id.* The *Calcasieu–Marine* court distinguished *National Bank of Commerce*, along with the other check-kiting cases, based on the basic differences between a check and a draft:

> The most important distinction is that, when the bank credits a *check*, it reasonably expects the *check* to be paid in the normal course of business. Such an expectation may be reasonable even if the bank knows that there are no funds in the drawee bank to cover the *check*, because of the depositor's credit at the drawee bank or because of the practice of many banks to honor overdrafts. But, with respect to the *drafts* deposited with the two banks here, there could have been no reasonable expectations. Although many previous *drafts* had been paid in the normal course of business, it was always up to the purchaser to honor or dishonor a *draft*.

**4.** The court went on to explain the difference between checks and drafts in more detail:
> [A collecting bank] will treat the draft as a "collection" item rather than a "cash" item. Checks, the most common items handled by the banks, are dealt with in bulk as "cash" items on the assumption that they will be honored in the overwhelming majority of cases; provisional credits are entered immediately for a check at all states of the collection process and automatically become final without further action upon payment by the drawee bank.... Documentary drafts, on the other hand, are handled as "collection" items and dealt with individually, rather than in the bulk, and since no assumption is made that they will be honored, no credits, not even provisional credits, are given until the item has been paid by the buyer.

*Calcasieu–Marine*, 533 F.2d at 300 (emphasis added) (citations omitted).[4]

In the present case, which involves deposited *checks*, the district court relied on *Calcasieu–Marine* to deny Reliance's motion for summary judgment, and explained:

> *Calcasieu–Marine* ... concerned drafts, not checks. The court was careful to distinguish checks from drafts before concluding its analysis. It noted that checks are different from drafts because there is a reasonable expectation that they will be paid in the course of business, *even if* the bank knows there are no funds to cover the checks. Although Reliance has attempted to distinguish the present case from the typical check-kiting cases discussed in *Calcasieu–Marine*, the court is not convinced that there is a difference since *Calcasieu–Marine* stated that the bank's expectation of payment could be reasonable even if it knew there were no funds to cover the check. There is no authority to support the conclusion that, as a matter of law, the transaction in controversy here was a loan.

*First Texas Sav. Assoc. v. Reliance Ins. Co.*, No. 3–87–1003–G at 5 (N.D.Tex. Nov. 21, 1989) (Memorandum Order denying summary judgment) (citations and footnote omitted).

We disagree with the district court's analysis because of the unique facts of this case.[5] In the typical check-kiting case, the kiter falsely represents that his deposits are supported with sufficient funds in the

*Calcasieu–Marine*, 533 F.2d at 300 (quoting E. FARNSWORTH, COMMERCIAL PAPER 345 (1968)) (footnote omitted).

**5.** We note initially that the Loan Exclusion clause in the present case, which excludes losses resulting from "any loan or transaction in the nature of a loan or extension of credit," is much broader than the exclusion in *Calcasieu–Marine*, which excluded only "any loan." 533 F.2d at 293. We consider this difference significant. *See Security Nat'l Bank v. Continental Ins. Co.*, 586 F.Supp. 139, 150 (D.Kan.1982) (if the clause excluding any "transaction in the nature of, or amounting to," a loan "contained only the word 'loan,' a check kiting scheme would not come within the loan exclusion").

accounts on which the deposited checks are drawn. But here, as the district court recognized, the evidence confirms that First Texas, because of the events preceding the loss in November 1984, knew of Rosenstein's practice of overdrawing his accounts and kiting checks.

Reliance argued in its summary judgment motion that, because of First Texas' knowledge, there could be no "false pretenses" and thus no coverage at all under Agreement (B). The district court, in denying Reliance's motion, acknowledged that First Texas could not rely on the fraud inherent in kiting to support its claim of false pretenses. But the court denied the summary judgment motion because it accepted First Texas' argument that the false pretenses consisted not of the fraud inherent in kiting but of Rosenstein's false representations that he was wealthy and was willing and able to repay any overdrafts that occurred. As the district court explained in its Memorandum Order:

> It is obvious that First Texas knew of Rosenstein's practice of overdrawing his bank account. Certainly, there was no misrepresentation of that fact, and First Texas was naive enough to accept Rosenstein's assurance that he would cover the overdrafts. As Reliance itself recognizes, however, First Texas believed Rosenstein could and would reimburse it if his deposits were not good or overdrafts were created, and it thought Rosenstein was wealthy enough to repay any and all advances to his accounts out of his general assets.
>
> *The misrepresentations which First Texas must prove that it relied on are the representations made by Rosenstein to the effect that he would immediately cover overdrafts in his account.* Because First Texas's reliance on these representations presents an issue of material fact, Reliance's motion for summary judgment on this issue must be denied.

Memorandum Order, *supra* at 4 (emphasis added, footnotes omitted). First Texas allowed Rosenstein access to its funds not because it reasonably expected the deposited checks to be paid by the drawee banks in the normal course of business, *see Calcasieu–Marine*, 533 F.2d at 300, but because it relied on Rosenstein's ability and willingness to *repay* the overdrafts created when the drawee banks returned the checks unpaid. In fact, Rozell testified that it was "acceptable" if Rosenstein was kiting so long as he repaid any resulting overdrafts.

The district court, in denying summary judgment, relied on *Calcasieu–Marine*'s statement that a bank may reasonably expect a check to be paid "even if [it] knows that there are no funds in the drawee bank to cover the check." *Id.* But the *Calcasieu–Marine* court stated that such an expectation *may* be reasonable "because of the depositor's credit at the drawee bank or because of the practice of many banks to honor overdrafts." *Id.* The *Calcasieu–Marine* court thus envisioned a scenario in which, despite the fact that the depositor has insufficient funds in the account on which the check is drawn, the bank may still reasonably rely on the *deposited check*. But here, First Texas relied not on the checks but solely on *Rosenstein's promise* to pay the overdrafts as he had always done. As the *National Bank of Commerce* court explained, the Loan Exclusion clause "contemplates a lending transaction knowingly entered into by the bank in reliance *on the customer's express agreement to repay*." 312 F.Supp. at 75 (emphasis added). Because it is uncontroverted that First Texas relied solely on Rosenstein's promise to repay overdrafts when it granted him immediate access to the funds represented by his check deposits, we find that First Texas made a "loan or transaction in the nature of a loan or extension of credit" as a matter of law. The Loan Exclusion clause excludes losses from these transactions.[6] First Texas

---

6. First Texas argues that, by holding that the Loan Exclusion clause excludes coverage of this loss associated with check-kiting, we render the Bond's "Uncollected Funds Exclusion" clause

meaningless. The Uncollected Funds Exclusion clause and the Loan Exclusion clause are two of the fifteen independent exclusion clauses contained in Section 2 of the Bond's Conditions and

"must have known that there was considerable risk in crediting the [deposits] before acceptance by the [drawee banks].... The insurers, who did not issue policies of credit insurance, did not take those risks and are not to be held accountable now, when the risks have turned bad." 533 F.2d at 300 (footnote omitted). We thus vacate the district court's judgment in favor of First Texas and hold for Reliance on the Bond coverage issue.

### B. JUDGMENT ON THE EXTRA-CONTRACTUAL CLAIMS

 Under Texas law, an insurance company that improperly denies, delays, or handles a claim may be liable to the insured both for breach of the duty of good faith and fair dealing, *see Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987), and for certain violations under TEX.INS.CODE art. 21.21, § 16. The jury found Reliance liable under both of these theories, and First Texas elected to recover under article 21.21, which provides for trebling of the amount of the insured's damages. *See* art. 21.21, § 16(b)(1). But because we have determined that the Bond does not provide coverage for First Texas' losses in this case, we are faced with the question of whether an insurance company may be liable for damages under article 21.21 even when it is not liable under the insurance contract.

The Texas Supreme Court has recently held that a plaintiff may recover damages from an insurer's breach of the duty of good faith and fair dealing even when there is no recovery under the insurance policy. *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex.1990) ("a breach of the duty of good faith and fair dealing will give rise to a cause of action in tort that is separate from any cause of action for breach of the underlying insurance contract"). Viles filed a claim under his homeowners insurance policies but failed to submit a sworn proof of loss within 91 days of the loss as the policies required. After Viles notified his agent of the claim, the insurance companies sent an adjuster and an engineer to inspect the house. After these inspections, but before the 91-day time period expired, the adjuster informed Viles that the companies would deny the bulk of his claims. Viles sued the companies for breach of the duty of good faith and fair dealing, and the jury found in his favor and awarded exemplary as well as actual damages. *Id.* at 566–67. The court of appeals reversed, holding that, as a matter of law, the companies had a reasonable basis for denying the claim because Viles had failed to request a jury finding that he had met (or the companies had waived) the policies' condition of a timely-filed proof of loss, and thus there was no proof of coverage. *Id.* at 567. The Texas Supreme Court reversed, noting that the "duty on the part of insurers to deal fairly and in

Limitations. The Uncollected Funds Exclusion, often referred to as the "check-kiting exclusion," excludes coverage for losses

> resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal....

The effect of this clause is to exclude from the Bond's coverage all losses that result when a *deposited check is returned unpaid, except* when the customer (or a representative) physically received the money withdrawn in reliance on the returned deposit while present in the bank's office. Thus, subject to the physical receipt exception, this clause excludes coverage

for check-kiting losses. Reliance cannot rely on this clause to avoid coverage for First Texas' loss because the jury found that Rosenstein or his representatives physically received the cashiers checks totalling $1,785,000 while present in First Texas' offices.

Our determination that the Loan Exclusion clause excludes coverage of First Texas' loss in this case does not render the Uncollected Funds Exclusion meaningless. This is so because, as we have explained, First Texas allowed Rosenstein to withdraw these funds because of its faith *in Rosenstein*, not in his *deposits*. In the typical check-kiting case, where the bank advances funds in reliance on the validity of the deposited item, the Uncollected Funds clause may apply. But in this case, where the bank advanced funds in reliance on the customer's ability and willingness to repay overdrafts, the Loan Exclusion clause, rather than the Uncollected Funds Exclusion clause, applies.

good faith with their insureds ... emanates not from the terms of the insurance contract, but from an obligation imposed in law 'as a result of a *special relationship* between the parties governed or created by a contract.' " *Id.* (quoting *Arnold,* 725 S.W.2d at 167). The court recognized that the failure of the insured to meet the insurance policies' requirements may, in certain circumstances, constitute a reasonable basis to deny the claim, but held that "[w]hether there is a reasonable basis for denial ... must be judged by the facts before the insurer at the time the claim was denied." *Id.* Because the insurance companies denied Viles' claim *before* the sworn proof of loss was due, "the failure to file that form within the 91–day period could not have been a basis for denial." *Id.* at 568.

*Viles* differs from the present case in that *Viles* concerned an insurer's liability for breach of the duty of good faith and fair dealing while First Texas elected to recover under article 21.21. No Texas court has held that a plaintiff can recover damages for unfair practices under article 21.21 even when the loss was not covered by the policy. But, like the duty of good faith and fair dealing, Reliance's obligations under article 21.21 are imposed by law separate and apart from the obligations under the Bond.[7] Moreover, a Texas appellate court recently recognized that the common law duty of good faith and fair dealing can itself "serve as the basis for a violation under ... article 21.21 section 16 of the insurance code." *Allied General Agency, Inc. v. Moody,* 788 S.W.2d 601, 604 (Tex.App.—Dallas 1990, writ denied) (citing *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 136 (Tex.1988)). Indeed, the district court in the present case submitted the requirements of the common law duty of good faith and fair dealing to the jury as a basis for First Texas' claim under article 21.21. Because the obli-

gations made enforceable by article 21.21, like the common law duty of good faith and fair dealing, are imposed independent of the duties under the policy itself, we believe that *Viles* allows an insured to recover under article 21.21 even in the absence of policy coverage. We thus hold that First Texas' article 21.21 claims survive our determination that the Bond does not cover First Texas' losses.

Nevertheless, we must reverse the judgment on First Texas' extra-contractual claims and remand this case for a new determination of whether Reliance breached its duties and, if so, what damages resulted from that breach. This jury believed that the Bond covered First Texas' loss, and found Reliance liable for unfair practices under article 21.21 based on that belief. A correct finding under article 21.-21, however, must be based on a determination that, despite the lack of coverage, Reliance breached its claims handling duties. First Texas may recover expenses and losses incurred during the handling and processing of the claim that result directly from a breach of the duty that Reliance owed First Texas under article 21.21. We must reverse the entire award under article 21.21 and remand for a new determination of Reliance's liability under article 21.21 in light of *Viles.*

### III. CONCLUSION

We vacate the judgment of the district court. We dismiss First Texas' claims against Reliance on the Bond. We remand the case for further consideration of the remaining issues consistent with this opinion.

**VACATED and REMANDED.**

---

7. Section 16 of article 21.21 affords relief to those injured by insurers engaging in (1) acts or practices declared to be unfair methods of competition in article 21.21, section 4, or (2) acts or practices declared to be unfair methods of competition in rules or regulations adopted by the Insurance Board, or (3) unfair or deceptive acts or practices in the business of insurance, or (4) unlawful deceptive trade practices as defined by section 17.46 of the Texas Business and Commerce Code.