OXFORD BANK AND TRUST, f/k/a Addison State Bank, Plaintiff-Appellee, v. HARTFORD ACCIDENT AND INDEMNITY COMPANY, Defendant-Appellant.

Second District    No. 3—97—0627

Opinion filed July 20, 1998.

Donald L. Mrozek, D. Kendall Griffith, and Christine L. Olson, all of Hinshaw & Culbertson, of Chicago, for appellant.

Eric D. Kaplan, of Kaplan & Papadakis, P.C., of Chicago, for appellee.

JUSTICE RATHJE delivered the opinion of the court:

Defendant, Hartford Accident & Indemnity Company, appeals from the judgment of the circuit court of Du Page County, which found defendant liable on the claim made pursuant to an indemnity bond by plaintiff, Oxford Bank & Trust Company, f/k/a Addison State Bank. Said liability totaled $251,459.93, a sum which included statutory prejudgment interest. This amount was subsequently reduced to $233,175.82, pursuant to defendant's posttrial motion.

On appeal, defendant raises four arguments, namely, (1) that the subject loss suffered by plaintiff was not covered because the acts of bank official James Porcaro were neither dishonest nor fraudulent and Porcaro did not have manifest intent to cause harm to defendant; (2) that the loss was not covered because it arose out of a loan and, further, that Porcaro did not act in collusion with Kenneth Vincenzo, Sr., nor did he obtain a financial benefit with a value of $2,500; (3) that the trial court erred in granting plaintiff's motion for summary judgment as to defendant's second affirmative defense; and (4) that plaintiff's loss is excluded under the exclusion governing uncollected deposits.

The following facts are taken from the record on appeal. Defendant issued a fidelity bond to plaintiff that was in effect from January 1, 1989, to January 1, 1992. This fidelity bond agreement provided defendant with coverage for:

"(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.00."

Further, the bond defines "loan" as:

" 'all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.' "

Also, the subject bond contained the following pertinent exclusions:

"(e) loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under insuring Agreement (A), (D), or (E).

* * *

(o) loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud, except when covered under Insuring Agreement (A)."

In October 1991, James Porcaro was hired by plaintiff to the position of vice-president, cashier, and chief operating officer. His primary duty was to run plaintiff's day-to-day banking operations, including the overseeing of checking accounts. When hired by plaintiff, Porcaro had been working in the banking business for 22 years. From his experience, Porcaro knew the warning signs that a customer was involved in a check-kiting scheme.

Testimony at trial described the nature of check kiting, which oc-

curs when a person draws on an account at one bank, deposits the checks in another bank, and then secures the cash before the checks' actual collection by the first bank. Further, check kiting involves the continual movement of funds from bank to bank. Due to such a scheme, the check-kiting customer's account will show a positive balance due to deposits into the account. However, these are "ledger balances" which do not represent actual funds in the subject account. If the scheme is successful, a bank will be left with an overdraft balance.

Early in Porcaro's tenure with plaintiff he had prepared a report on a prior check-kiting scheme, which was forwarded to the Federal Bureau of Investigation. Because of this prior scheme, plaintiff's president, Ronald Peterson, had expressly directed Porcaro to be on the alert for evidence of possible check kiting involving any of plaintiff's accounts. Peterson instructed Porcaro to review personally each large check over $2,500, along with the check's endorsement. This daily inspection was necessary to determine if a check-kiting scheme was afoot. Further, Peterson told Porcaro to inform him of any actual or potential check kites in any customer's account. Without Peterson's prior approval, Porcaro was not authorized to approve any overdrafts exceeding $25,000.

Prior to his employment with plaintiff, Porcaro had been employed for 10 years as vice-president and cashier of Lakeside Bank (Lakeside). During his time at Lakeside, Porcaro came to know a Lakeside customer by the name of Kenneth Vincenzo, Sr. (Vincenzo), who ran an automobile auction business. Vincenzo had a collections account, which meant that Lakeside, in a fiduciary role, held titles to automobiles for its sellers. Typically, prior to the issuance of the seller's title, Lakeside had to receive the actual funds collected from the customer. When it had received the money, Lakeside would then release the title to the automobile and pay the seller with an official bank check or cashier's check.

While at Lakeside, Porcaro authorized the release of automobile titles to Vincenzo and, in one instance, issued a Lakeside check to Vincenzo in excess of $80,000 against uncollected funds. As a result of this transaction, Lakeside lost over $30,000. Following this incident, Lakeside's executive vice-president, Norman Arnos, told Porcaro that he believed Porcaro's behavior in this incident was very unusual. Arnos subsequently reported Porcaro's involvement in this incident to Lakeside's executive committee.

After being hired by plaintiff, Porcaro informed Vincenzo that he was working for plaintiff. On January 18, 1991, Vincenzo opened an account with plaintiff. Based on plaintiff's practice, Porcaro was the bank officer in charge of this account. Vincenzo also maintained an account at Old Second Community Bank of North Aurora (Old Second).

In the first month after opening the subject account, Vincenzo deposited approximately $43,000 into the subject account from his Old Second account. Within a short time, overdrafts in Vincenzo's account with plaintiff began to occur. Gloria Distel, plaintiff's bookkeeping manager, who reported directly to Porcaro, informed him of the overdrafts, asking whether to approve or deny the overdraft. On each occasion, Porcaro told Distel to approve the overdraft; he advised her that "there would not be a problem."

In February 1991, Vincenzo deposited approximately $362,000 into his account with plaintiff from his accounts at other banking institutions. During this month, there were separate overdrafts on the subject account. At the same time, Vincenzo was moving large checks in amounts up to $65,000 to and from his Old Second account.

Further, in March 1991, Vincenzo, from a variety of his other accounts, deposited $1,628,800 into his account with plaintiff. Numerous large checks, including one for $156,000, were drawn on Vincenzo's Old Second account and deposited in the subject account. At the same time, virtually identical large withdrawals were made from the subject account payable either to Vincenzo or one of his businesses, which were then deposited in his Old Second account. In this month, Porcaro approved overdrafts on the subject account of $17,152.91, $54,312.07, $113,955.54, $57,979.07, $6,904.72, and $140,808.52. At this time, Distel told Porcaro that the overdrafts on Vincenzo's account were "suspicious." Porcaro assured Distel that Vincenzo would take care of the overdrafts and told Distel to pay them. Porcaro further stated to Distel that there was no check kite in Vincenzo's account.

In April 1991, over $3 million moved through Vincenzo's account with plaintiff. Again, large checks were drawn on Vincenzo's Old Second account and deposited into the subject account. At the same time, virtually identical amounts were withdrawn from the subject account, payable to Vincenzo or one of his businesses. Once again, Distel told Porcaro of her belief that Vincenzo was engaged in a check-kiting scheme. Porcaro's response was the same as before, i.e., that there was no problem with Vincenzo's account.

In April 1991, plaintiff instituted a computerized check-kite detection system (system), which was under the direction of Thomas Goshhorn, plaintiff's comptroller. The system's first report was produced on April 25, 1991. Therein, Vincenzo's account was identified as containing a potential check kite. Goshhorn reviewed the report and verified its information regarding the activity pertaining to the account. Goshhorn then discussed the report with plaintiff's vice-president, Effie Kastritis. Subsequently, on the same day, Kastritis and

Goshhorn met with Porcaro regarding the report. Porcaro maintained that there was no check kite in Vincenzo's account. He asked for and was given the report. The report, which could not be duplicated, was never seen again.

On April 26, 1991, Porcaro issued a cashier's check to Vincenzo for $20,205 on uncollected funds. On May 6, 1991, Old Second returned three checks amounting to $228,000, for insufficient funds. These three checks had created a $228,000 ledger entry with plaintiff. However, the return of the checks created an overdraft balance in Vincenzo's account of $195,907.95. Prior to the presentation of these three checks, Vincenzo's account had a balance of $32,097.05.

Vincenzo's account was closed immediately, and Porcaro was fired in the first week of May 1991. Further, during his brief tenure with plaintiff, Porcaro embezzled a total of $11,168.74 in plaintiff's funds. These acts of embezzlement, to which Porcaro pleaded guilty, occurred on 10 separate dates in November 1990 and January, February, March, and April 1991. Subsequently, the Federal Deposit Insurance Corporation (FDIC) entered an order of prohibition against Porcaro, which denied him employment in the banking business without the FDIC's express authorization. Also, on October 16, 1992, Vincenzo pleaded guilty to bank fraud in the instant check-kiting scheme.

On July 29, 1991, plaintiff submitted a claim to defendant to recover losses from the check-kiting scheme. On January 7, 1992, defendant denied plaintiff's claim. On July 7, 1992, plaintiff filed its complaint against defendant.

Count I sought a declaratory ruling that, pursuant to section (A) of the bond, defendant had a duty to indemnify plaintiff for losses it had sustained due to Porcaro's embezzlement and the Porcaro/Vincenzo check-kiting scheme. Count II sought a declaratory ruling that, pursuant to section (B) of the bond, defendant had a duty to indemnify plaintiff for the losses it had sustained as a result of Porcaro's embezzlement and the check-kiting scheme. Count III alleged a breach of implied good faith and fair dealing against defendant and sought a judgment of at least $238,000. Count IV alleged unreasonable and vexatious delay in settling plaintiff's claim in violation of the Illinois Insurance Code (215 ILCS 5/155 (West 1992)). Count IV sought attorney fees and costs, as well as punitive damages.

Defendant subsequently filed its answer and affirmative defenses, the latter of which relied on the above-cited bond exclusions (e) and (o), for "loan loss" and "uncollected funds," respectively. The trial court later granted plaintiff's motion for summary judgment as to the affirmative defense tied to "loan loss," finding that plaintiff's losses were not the result of a "meeting of minds" necessary to constitute a

loan. Defendant's motion for summary judgment was denied. The matter proceeded to a bench trial, which was held in July 1997.

At the conclusion of the trial, the trial court entered its judgment order, which stated in pertinent part:

"3. That James Porcaro was the cashier and chief operating officer at Plaintiff Oxford Bank and Trust Company from October, 1990 to May, 1991.

4. That Kenneth Vincenzo, Sr. opened a checking account at the Plaintiff Oxford Bank and Trust Company in January, 1991, and the bank officer responsible for that account was James Porcaro.

5. That shortly thereafter a course of conduct ensued which involved the deposit and re-deposit of certain instruments which were drawn on funds purportedly on deposit and in the account of Kenneth Vincenzo, Sr. at Plaintiff Oxford Bank and Trust Company and an account of Kenneth Vincenzo, Sr. at The Old Second Community Bank of North America. Said course of conduct is known in the banking industry as a check kiting scheme.

6. That as a result of this scheme, large overdrafts occurred in the Kenneth Vincenzo, Sr. account at Plaintiff Oxford Bank and Trust Company. These overdrafts were approved for payment by James Porcaro; and as a result thereof, Plaintiff Oxford Bank and Trust Company suffered a loss in the amount of One-Hundred Ninety-Five Thousand Nine-Hundred Seven Dollars and Ninety-Five Cents ($195,907.95).

7. That it is clear and convincing that the loss resulted directly from the dishonest or fraudulent acts committed by James Porcaro acting alone or with another and were committed by James Porcaro with the manifest intent to cause the Plaintiff Oxford Bank and Trust Company to sustain such loss and to obtain financial benefit for another person, Kenneth Vincenzo, Sr. based on the following acts and circumstances surrounding the acts and conduct of James Porcaro in his capacity as an officer of the Plaintiff Oxford Bank and Trust Company.

A. James Porcaro had been charged with responsibility to implement a check kiting detection plan, to personally review all checks in the amounts of $25,000 or larger, and to report to the bank president any suspicion of check kiting in a customer's account.

B. James Porcaro and Kenneth Vincenzo, Sr. had a prior relationship at another financial institution, Lakeside Bank, which suffered a loss when James Porcaro, as an officer and employee of Lakeside Bank, authorized the release of automobile titles being held as collateral and issued checks at the request of Kenneth Vincenzo, Sr. against uncollected funds.

C. That in March and April of 1991, Plaintiff Oxford Bank and Trust Company's bookkeeping manager advised James Porcaro

that the activity in the Kenneth Vincenzo, Sr. account was suspicious as a check-kiting scheme, all of which James Porcaro denied.

D. That on or about April 25th, a check kite report was obtained from an outside source by the Plaintiff Oxford Bank and Trust Company, indicating a possible check kite in the Kenneth Vincenzo, Sr.'s account. James Porcaro denied that the check kite was occurring, and the report, which was last seen in the possession of James Porcaro, has never been found.

E. After being so advised of the suspected check kite in the Kenneth Vincenzo, Sr. account, James Porcaro continued to issue Cashier's Checks to Kenneth Vincenzo, Sr. against funds which were not on deposit.

F. That James Porcaro continued to approve overdrafts regarding the Kenneth Vincenzo, Sr. account in excess of James Porcaro's authority of $25,000; and at no time did he report to the bank's president any suspicion of check kiting in Kenneth Vincenzo, Sr.'s Account notwithstanding the foregoing knowledge and with James Porcaro's specific duty in this regard.

G. That James Porcaro, with his background and experience in the banking industry and his position at Plaintiff Oxford Bank and Trust Company, knew or reasonably should have known that a check kite scheme was occurring in the account held by Kenneth Vincenzo, Sr. at Plaintiff Oxford Bank and Trust Company between February and May of 1991.

8. That the denial of claim by Defendant Hartford Accident and Indemnity company was not [an] unreasonable and vexatious evaluation of the Plaintiff Oxford Bank and Trust Company claim or interpretation of the applicable policy provisions.

9. That the loss suffered by Plaintiff Oxford Bank and Trust Company is easily ascertainable by computation, and Oxford Bank and Trust Company is entitled to statutory pre-judgment interest from the date that the proof of loss was filed on July 30, 1991, with the Defendant Hartford Accident and Indemnity Company."

The trial court then entered a judgment in plaintiff's favor of $251,459.93, which included $55,551.98 in statutory prejudgment interest. Further, the trial court denied plaintiff's claim for damages due to defendant's allegedly unreasonable and vexatious handling of plaintiff's claim.

Initially, defendant argues that the loss is not covered under coverage (A) of the subject bond. In support of this contention, defendant asserts that Porcaro's conduct was not fraudulent or dishonest. Defendant also maintains that Porcaro did not act with manifest intent to cause harm to the plaintiff. In contrast, plaintiff argues that the trial court correctly found that Porcaro's action was fraudulent or dishon-

est and that Porcaro acted with a manifest intent to cause plaintiff, Oxford, to sustain a loss pursuant to the bond.

A court of review will not overturn the trial court's conclusion in a bench trial unless it is against the manifest weight of the evidence. *In re Estate of Elson*, 120 Ill. App. 3d 649, 655 (1983). Moreover, the reviewing court will not reverse a judgment following a bench trial unless the opposite conclusion is clearly evident. *Interstate Material Corp. v. City of Chicago*, 273 Ill. App. 3d 527, 529 (1995).

■ We will first address that portion of defendant's argument that Porcaro's actions were not dishonest. It is evident from the case law that the term "dishonest" in relation to fidelity bonds has a rather broad definition. See, *e.g., Home Indemnity Co. v. Reynolds & Co.*, 38 Ill. App. 2d 358, 375 (1962). It has been interpreted to mean an act that is manifestly unfair to the employer and that palpably subjects it to potential loss. *Home Indemnity*, 38 Ill. App. 2d at 375. Although such an action may not technically be criminal in nature, it nevertheless shows a significant lack of probity, integrity, or trustworthiness. *Home Indemnity*, 38 Ill. App. 2d at 375. Moreover, the specific act need not be one involving an employee's criminal liability, nor is it necessary that the employee personally benefits from the act. *Home Indemnity*, 38 Ill. App. 2d at 375.

■ Initially, defendant contends that the trial court should not have relied on the prior relationship of Porcaro and Vincenzo at Lakeside Bank in determining this case. In effect, defendant contends that this evidence is similar to inadmissible evidence in a criminal trial that only demonstrates that the defendant has committed bad acts in the past. We do not agree. Clearly, the evidence of Porcaro's and Vincenzo's past relationship at Lakeside was admissible to demonstrate generally their *modus operandi*. See *People v. Oaks*, 169 Ill. 2d 409, 454 (1996).

■ Next, defendant maintains briefly that the trial court's finding that Porcaro issued cashiers' checks on uncollected funds is not supported by the record. Specifically, the trial court wrote, "After being so advised of the suspected check kite in the *** Vincenzo *** account, James Porcaro continued to issue Cashier's Checks [*sic*] to *** Vincenzo ***." Technically, defendant's contention is correct, *i.e.*, there were enough funds in Vincenzo's account on April 26, 1991, to cover the cashier's check made out to Vincenzo in the amount of $20,205. However, given the unrefuted evidence of the scheme perpetrated by Vincenzo at that time, this erroneous finding is of little moment.

In support of its assertion that Porcaro was not engaged in dishonest activity, defendant cites numerous cases, most of which, as plaintiff points out, deal with instances of embezzlement and, thus, have little

relevance in this check-kiting case. The case cited by defendant that is most similar to the appeal at bar is *Rock Island Bank v. Aetna Casualty & Surety Co.*, 706 F.2d 219 (7th Cir. 1983). In *Rock Island*, the bank president issued seven letters that committed the bank to assume loans or to honor drafts payable to a customer's account. These letters of commitment contravened two of the bank's resolutions. The letters were not reflected in the bank's books of account, nor were they disclosed to bank examiners. However, files of the transactions were kept at the bank, and the bank president testified that other officials of the bank were aware of the transactions. *Rock Island*, 706 F.2d at 220-22.

The trial court granted the plaintiff bank's motion for summary judgment. In reversing the granting of summary judgment, the *Rock Island* court stated, *inter alia*, that the evidence of deceptive conduct was not unequivocal. Further, the *Rock Island* court noted, *inter alia*, that the bank president did not personally profit from the transaction and concluded that one could reasonably find from the record that the loss was due to errors in judgment, incompetence, or negligence. *Rock Island*, 706 F.2d at 222.

■ Contrary to *Rock Island*, the appeal at bar went to trial, at the conclusion of which the trial court ruled for the plaintiff. Moreover, in *Rock Island*, the only allegedly dishonest act committed by the bank president was that of exceeding his authority. In the appeal at bar, Porcaro's actions were of a far different nature. After being employed by plaintiff, Porcaro was charged with reviewing all large checks and reporting any suspicion of check kiting to plaintiff's president. In March and April 1991, plaintiff's bookkeeper went to Porcaro with her suspicions that the activity in Vincenzo's account indicated a check-kiting scheme. Porcaro ignored her concerns. He never alerted the president to the suspicious activity related to Vincenzo's account. When confronted on April 25, 1991, with a report from plaintiff's new check-kiting detection system, which indicated potential check-kiting activity in Vincenzo's account, Porcaro further denied that any such scheme was occurring. He then took the report, which was never seen again. Within 10 days, three checks totaling $228,000 were returned to plaintiff for insufficient funds. Based on this evidence, Porcaro's actions of failing to fulfill his job duties, ignoring obvious evidence of Vincenzo's check-kiting scheme, and steadfastedly denying such a scheme when confronted with clear evidence of it were properly characterized by the trial court as dishonest.

We find that the trial court's conclusion as to the dishonesty of Porcaro's actions is supported by the evidence.

■ Next, defendant argues that the trial court erred in finding

that Porcaro's actions exhibited a manifest intent to harm plaintiff. The term "intent" has been described as "denot[ing] that the actor desires to cause the consequences of his action or believes that the consequences are substantially certain to result from it." *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 620 (1980). "Manifest intent" occurs when the circumstances indicate that a particular result is "substantially certain" or is "apparent or obvious" as a result of the employee's actions. *Heller International Corp. v. Sharp*, 974 F.2d 850, 859 (7th Cir. 1992).

■ Defendant maintains that Porcaro's conduct could be characterized as negligent or indicative of poor business judgment but does not manifest intent to harm plaintiff. For example, defendant points out that when the overdrafts began Porcaro contacted Vincenzo, who then made a deposit into his account with plaintiff. Defendant reasons that if Porcaro had manifest intent to harm plaintiff he would not have taken steps to rectify the problem. Defendant contends that the evidence of Porcaro's initial attempts to get Vincenzo to cover the overdrafts would, *if* coupled with other evidence of his properly performing his job, serve to support this argument regarding lack of manifest intent to harm plaintiff. However, as demonstrated above, there is more than enough material evidence of Porcaro's willful failure to perform his job to outweigh any examples of his attempts to pursue his employer's interests.

Again, the various cases cited by defendant are unpersuasive. For example, in *First Federal Savings & Loan Ass'n v. Transamerica Insurance Co.*, 935 F.2d 1164 (10th Cir. 1991), a loan officer made three loans, all of which ended in default. In each circumstance, the loan officer initially turned down the loan application. The loan officer then approved the loan to another party, and the *First Federal* court found that the loan officer's actions indicated his poor business judgment, not the manifest intent to harm his employer.

*First Federal* presents a far different situation than is present in the appeal at bar. There, the loan officer's actions could be chalked up to bad decision making. Here, there is no such evidence. Porcaro's actions did not demonstrate a lack of good business sense. Instead, they reflected a reckless disregard for a substantial risk to plaintiff.

Based on the record before us, we find no reason to question the trial court's finding that Porcaro manifestly intended to cause harm to plaintiff.

■ Defendant next maintains that plaintiff's loss is not covered under insurance agreement (A) of the bond, which is cited above. Defendant argues that the subject loss arises out of a loan and that Porcaro neither acted in collusion with Vincenzo nor obtained a financial

benefit with a value of $2,500. In response, plaintiff contends that the trial court properly held that its losses were covered under insuring agreement (A). Plaintiff further asserts that, because there is no evidence that the subject loss resulted from a loan, it does not have to provide evidence of Porcaro's collusion with Vincenzo or a financial benefit of over $2,500 to him.

We find that a case cited by plaintiff, *First National Bank v. Insurance Co. of North America*, 424 F.2d 312 (7th Cir. 1970), provides this court with sufficient guidance in addressing defendant's unlikely contention that, in effect, the overdrafts on Vincenzo's account were loans. In *First National Bank*, a customer of the bank engaged in a check-kiting scheme, which resulted in a negative balance in the customer's account and a loss to the bank. As a result, the bank sought coverage for the loss under the fidelity bond issued by the defendant insurer. Defendant refused payment, maintaining that the bank's losses were loans, which were precluded from coverage under the bond. In denying defendant's argument, the *First National Bank* court wrote:

> "It is unlikely, then, that Decatur intended to make open-ended, unsecured loans to Community [the customer] by allowing it credit against deposits that were not only uncollected but not even covered by funds in the drawee bank. A loan implies an agreement, a meeting of the minds. Mildly stated, it does not comport with the usual understanding to say that every time one person wrongfully obtains property from another and thus becomes legally obligated to restore it, he has succeeded in obtaining a loan from his victim. In the words of the Eighth Circuit: 'It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word "loan," as used in the exclusion clause of this indemnity bond, to cover the obligation imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks.' " *First National Bank*, 424 F.2d at 316, quoting *Hartford Accident & Indemnity Co. v. Federal Deposit Insurance Corp.*, 204 F.2d 933, 937 (8th Cir. 1953).

Similarly, we see no evidence of a meeting of the minds between plaintiff and Vincenzo necessary for a finding that the subject losses were in fact loans. We share the *First National Bank* court's view that any professional who dealt in such matters would not construe the term "loan" to include the losses arising from Vincenzo's check-kiting scheme.

Defendant's citations to *Pacenta v. American Savings Bank*, 195 Ill. App. 3d 808 (1990), and section 4—401 of the Uniform Commercial Code (UCC) (810 ILCS 5/4—401 (West 1994)) are not persuasive. Neither *Pacenta* nor section 4—401 addresses situations involving check-

kiting schemes, and they are of little relevance here. Further, *Affiliated Bank/Morton Grove v. Hartford Accident & Indemnity Co.*, No. 91 C 4446 (N.D. Ill. April 23, 1992) (mem. op.), is an unpublished disposition and, thus, is of no precedential value in this matter.

We find that the trial court properly found that the subject losses did not arise out of loans. An opposite conclusion would strain credulity beyond the breaking point. Because of this determination, we do not need to address the issue of whether there was sufficient evidence of Porcaro's collusion or his receiving a benefit of over $2,500 as a result of his part in the situation.

Defendant's third argument is that the trial court erroneously granted plaintiff's motion for summary judgment as to defendant's second affirmative defense, which was based on the above-cited exclusion (e). Defendant maintains that even if the overdrafts are not loans courts in other jurisdictions have held that losses incurred in check-kiting schemes are excluded from coverage under the exclusions similar to the subject exclusion (e). In response, plaintiff argues that the trial court was correct in granting summary judgment as to defendant's second affirmative defense and properly held that the losses sustained by plaintiff were not loans as contemplated in the bond.

■ An insurance policy's construction presents a question of law, which can be disposed of by summary judgment. *Hettenhausen v. Economy Fire & Casualty Co.*, 154 Ill. App. 3d 488, 491 (1987). Summary judgment is also applicable where the assertion of an affirmative defense creates an issue of law. *City National Bank v. Reiman*, 236 Ill. App. 3d 1080, 1090-91 (1992).

The basis of defendant's argument is the case of *First Texas Savings Ass'n v. Reliance Insurance Co.*, 950 F.2d 1171 (5th Cir. 1992), which is readily distinguishable from the instant appeal. In *First Texas*, a customer of the savings association, Norman Rosenstein, represented that he was extremely wealthy and that "he required special attention to conduct his real estate and securities trading businesses." *First Texas*, 950 F.2d at 1172. First Texas's employees believed Rosenstein and afforded him "special privileges that included immediate access to funds from deposited checks and a 'pay-all' computer code that allowed Rosenstein to draw on his accounts even when the funds in those accounts were insufficient to cover the withdrawals." *First Texas*, 950 F.2d at 1172-73. This arrangement, which lasted from 1982 to 1984, covered hundreds of overdrafts totaling millions of dollars.

In fact, Rosenstein was not an extremely wealthy person. Instead he was involved in a check-kiting scheme in which he was using First Texas's money to finance large security investments. Eventually, the scheme collapsed, and First Texas was left with a loss of $8.6 million.

The district court denied defendant's motion for summary judgment, wherein the defendant had argued that the loan exclusion clause applied to check-kiting schemes.

On appeal, the *First Texas* court disagreed with the district court's denial of defendant's motion for summary judgment due to the "unique facts of the case." In finding that the district court had erred in denying defendant's motion for summary judgment, the *First Texas* court stated, *inter alia*:

> "In the typical check-kiting case, the kiter falsely represents that his deposits are supported with sufficient funds in the accounts on which the deposited checks are drawn. But here, as the district court recognized, the evidence confirms that First Texas, because of the events preceding the loss in November 1984, knew of Rosenstein's practice of overdrawing his accounts and kiting checks.
>
> * * *
>
> *** Because it is uncontroverted that First Texas relied solely on Rosenstein's promise to repay overdrafts when it granted him immediate access to the funds represented by his check deposits, we find that First Texas made a 'loan or transaction in the nature of a loan or extension of credit' as a matter of law. The [subject] Loan Exclusion clause excludes losses from these transactions." *First Texas*, 950 F.2d at 1176-77.

We find that *First Texas* is factually inapplicable to the appeal at bar. The *First Texas* court admitted that it based its decision on the unique facts of the case, the implication being that if the typical check-kiting scheme were involved, it would not have reversed the district court's denial of defendant's summary judgment motion

Moreover, Rosenstein's actions in *First Texas* are far different from Vincenzo's in the instant appeal. Rosenstein told the First Texas officials that he was an extremely wealthy individual who required special attention to conduct his business. Relying on these representations, First Texas granted Rosenstein special privileges, including allowing him to draw on accounts even when funds in those accounts were not sufficient to cover withdrawals. In effect, First Texas actively promoted Rosenstein's check-kiting scheme, which lasted over two years.

Here, Vincenzo made no such statements to plaintiff's employees concerning his "extreme wealth." Thus, there was no corresponding reliance on such a representation by plaintiff, a factor emphasized by the *First Texas* court. Further, Vincenzo was granted no special privileges and plaintiff's employees, outside of Porcaro, did nothing to aid and abet the check-kiting scheme. Also, Rosenstein's scheme was allowed to last over two years, while Vincenzo's scheme, when finally

uncovered by plaintiff's officials, was terminated immediately. For these reasons, we find that *First Texas* is of no support to defendant's contention, and we conclude that the trial court did not err in granting plaintiff's motion for summary judgment as to defendant's second affirmative defense.

Defendant's final argument is that the above-cited exclusion (o) of the bond further excludes the subject loss from coverage. In response, plaintiff concedes that exclusion (o), the check-kiting exclusion, would normally exclude check-kiting loss. However, plaintiff asserts that defendant ignores the fact that exclusion (o) precludes coverage for check-kiting losses "except when covered under Insuring Agreement (A)."

As has been demonstrated above, the trial court properly found that the subject losses were covered under insuring agreement (A). Thus, exclusion (o) does not preclude the subject check-kiting losses from coverage.

For reasons stated above, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

BOWMAN and THOMAS, JJ., concur.